2006 VT 49A

# State of Vermont v. Herman L. Yoh
# In re Appeal of Herman L. Yoh

[910 A.2d 853]

Nos. 00-160 & 05-083

Present: Reiber, C.J., Dooley and Johnson, JJ., and Allen, C.J. (Ret.) and Gibson, J. (Ret.), Specially Assigned

Opinion Filed September 8, 2006

318

320

*Lauren Bowerman*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee (00-160).

*Robert Appel*, Defender General, and *William A. Nelson*, Appellate Attorney, Montpelier, for Defendant-Appellant (00-160).

*Michael Rose*, St. Albans, for Petitioner-Appellant (05-083).

*Robert Simpson*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Respondent-Appellee (05-083).

¶ 1. **Johnson, J.** This appeal arises from the first-degree murder conviction of appellant Herman Yoh for the 1997 killing of his wife, Mary Yoh. We have consolidated our review of appellant's direct appeal and his petition for post-conviction relief (PCR). In his direct appeal, appellant argues that the district court erred by: (1) failing to suppress his confession; (2) admitting evidence of his prior bad acts; and (3) refusing to instruct the jury on the lesser-included offense of voluntary manslaughter. In his appeal from the denial of his PCR petition, appellant contends that the superior court erred by granting summary judgment despite the existence of genuine issues of material fact regarding appellant's claim of ineffective assistance of counsel. We affirm appellant's conviction, but we reverse in part the superior court's grant of summary judgment with respect to appellant's PCR petition, and we remand the petition to the superior court for further proceedings. We also consider appellant's challenge to his sentence, raised after oral argument in light of our recent decision in *State v. Provost*, 2005 VT 134, 179 Vt. 337, 896 A.2d 55, and we remand to the district court for resentencing.

¶ 2. Appellant was convicted by a jury of first-degree murder in October 1999 and sentenced to life without the possibility of parole in April 2000. The body of Mary Yoh was found, wrapped in a blanket, beside a rural road in Williston, Vermont, on March 7, 1998. She had been strangled to death, and there were bruises on her face. Police located appellant in Reading, Pennsylvania, and Pennsylvania state troopers arrested him on March 18, 1998. The Pennsylvania troopers, prior to interviewing appellant, read him a form listing his *Miranda* rights, and appellant signed a form waiving these rights. During the interview, the troopers, acting on instructions from law enforcement personnel in Vermont, did not inform appellant that Mary's body had been found, instead asking if he could provide any information regarding her disappearance. Appellant told the Pennsylvania troopers that he had last seen Mary on December 20, 1997, the day after he and

Mary had attended a Christmas party for the staff of the Residence Inn in Burlington, where Mary had worked. The party took place at the Radisson Hotel in Burlington, and the Yohs had reserved a room at the hotel. Appellant told the troopers he had taken Mary home from the party because she was feeling ill from drinking too much. He said that he left her in their home the next day, called her workplace and told them she would not be coming in that day, and left to run some errands. When he returned, Mary was gone. According to his story, he remained for another day, then left for Reading, Pennsylvania, where his former wife and children lived. When asked for an explanation of why Mary had disappeared, appellant mentioned that she had been involved in a legal dispute with a Vermont bail bondsman named Shelley Palmer, who once employed appellant. After this interview, appellant was charged with Mary's murder.

¶ 3. On March 20, 1998, two days after appellant's interview with the Pennsylvania troopers, Vermont State Police detectives Dane Shortsleeve and Thomas Nelson interviewed appellant at the Pennsylvania State Police barracks. After again reading appellant his *Miranda* rights, the detectives conducted a tape-recorded interview, in which they continued to act as if Mary were only missing, not dead. Appellant referred them to the Pennsylvania troopers' interview notes and continued to assert that he had last seen Mary the morning after the party. After approximately two hours of questioning, the detectives informed appellant that Mary's body had been found and that she had been murdered. Appellant reacted as if he was surprised, and he did not change his story. The detectives then began to accuse appellant of committing the murder. They pointed out inconsistencies between appellant's story and the physical evidence, including Mary's autopsy results, blood spatters on the walls of the Yohs' hotel room, and the accounts of witnesses who had heard an argument in the room. Appellant denied that there had been an argument or a fight between Mary and him, and he continued to deny any role in Mary's disappearance. Finally, he accused the detectives of "trying to trip me up" and said "it all stops here." When Detective Shortsleeve continued to talk to him, appellant said, "You're trying to trip me up, you get an attorney in here or something." Detective Shortsleeve insisted that he was not trying to trip appellant up. Detective Nelson then asked appellant if he wished to stop talking to the detectives, and appellant responded, "Yeah." When Detective Shortsleeve asked him why he wanted to stop talking, appellant responded, "Because." Detective Shortsleeve then continued questioning appellant for several more minutes, attempting

to convince appellant to help his own cause by portraying the murder as an accident, stating that appellant would not be able to talk to the detectives again, and at one point, saying:

> You expect to get out of jail before you're ninety years old, you need to tell us. Goes right here on the tape, you're not going to get another opportunity. You know we're talking to your family, you want to leave them with any good feelings, let us be able to tell them that this was an accidental thing. Tell us what happened in the room that night.

Appellant responded that he had already told them what happened, and after a few more statements about the strength of the case against appellant, the detectives ended the interview.

¶ 4. Later the same day, while being transported from the barracks by one of the Pennsylvania state troopers who had conducted the original interview, appellant asked the trooper whom the Vermont detectives would talk to next. The trooper responded that he did not know. Appellant repeated his question, and the trooper said that he did not know, but that if it were his investigation, he would find out whether appellant's family in Pennsylvania had any information. A short time later, appellant told the trooper, "If you can keep those guys off my family, I will tell them everything they want to know." He was then brought back to the barracks, and the Vermont detectives were informed that appellant wanted to talk to them again.

¶ 5. When appellant arrived at the barracks, Detectives Shortsleeve and Nelson, after reading appellant his *Miranda* rights again and having him sign another waiver, conducted appellant's third interview, which was videotaped. During this interview, appellant admitted that he and Mary had an argument in the hotel room, and that Mary threatened to call the police. Appellant stated that when Mary reached for the telephone, he "blacked out." When he awoke, Mary was dead. Appellant claimed that he "snapped" and could not remember what happened after Mary reached for the telephone. He then described wrapping Mary's body in a blanket, carrying the body to his car, and driving to the place where the body was found. When the detectives asked whether appellant had any doubt that he had killed Mary, he responded that he could not remember doing so, but that there was no one else in the room.

¶ 6. Prior to trial, appellant's counsel, Jerry Schwarz, informed the trial court that he would not seek suppression of appellant's confession

because his investigation revealed no basis for suppression. The videotape of appellant's confession and Detective Shortsleeve's description of his two interviews with appellant were admitted into evidence without objection. Also before trial, Schwarz moved to suppress evidence of appellant's prior physical abuse of Mary, including a May 1996 domestic assault that resulted in a conviction, a November 1996 assault that was reported to police, and a January 1997 complaint to the police about appellant's apparent theft of Mary's money and her car. The trial court admitted evidence of the May 1996 and January 1997 incidents but excluded evidence of the November 1996 incident on hearsay grounds.

¶ 7. At trial, in addition to evidence of appellant's statements and his prior misconduct, the jury heard testimony from a forensic expert as to the cause and time of Mary's death, and from guests at the hotel who heard an argument between appellant and Mary on the night of the party. Appellant's defense consisted primarily of evidence, including his own testimony, that Shelley Palmer, the bail bondsman appellant had mentioned in his interview with the Pennsylvania troopers, had hired two hit men, who entered appellant's hotel room, knocked him unconscious, and killed Mary. At the conclusion of the trial, the jury received instructions with respect to both the voluntariness of appellant's confession and the purpose of the evidence of appellant's prior conduct. Schwarz requested an instruction on the lesser-included offense of voluntary manslaughter, but the trial court denied this request and instructed the jury regarding first-degree and second-degree murder. The jury convicted appellant of first-degree murder, and the trial court, after a sentencing hearing, sentenced appellant to a term of life without parole.

¶ 8. Appellant appealed his conviction. While the appeal was pending, appellant moved for a stay of the proceedings so that he could file a PCR petition. We granted the stay, and appellant filed his petition for PCR in the superior court, alleging ineffective assistance of counsel. The State moved for summary judgment, and the superior court granted the motion, finding that, regardless of Schwarz's effectiveness, any errors by counsel did not prejudice the outcome of the trial. Appellant appealed from the superior court's grant of summary judgment, and we consolidated appellant's direct appeal and his PCR appeal for review.

## I. The Direct Appeal

¶ 9. In his direct appeal, appellant asserts that the district court erred by: (1) failing to suppress his confession; (2) admitting evidence of his prior bad acts; and (3) refusing to instruct the jury on the lesser-included offense of voluntary manslaughter.[1] We reject these claims of error and affirm appellant's conviction.

### A.

¶ 10. Appellant first contends that it was error for the district court not to suppress his confession because the statement was rendered involuntary by the Vermont detectives' failure to end appellant's second interview when he invoked his rights to remain silent and to have counsel present during questioning. "When considering a motion to suppress, we review the trial court's factual findings for clear error; we review its legal conclusion de novo." *State v. Beer*, 2004 VT 99, ¶ 24, 177 Vt. 245, 864 A.2d 643.

¶ 11. Under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), law enforcement officers must warn a person in custody "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Appellant does not dispute that he was warned of these rights, and waived them in writing, prior to

---

[1] The State argues that Schwarz failed to preserve appellant's first and third arguments for appeal. This would ordinarily result in plain-error review. See *State v. Oscarson*, 2004 VT 4, ¶ 27, 176 Vt. 176, 845 A.2d 337 ("'Plain error exists only in exceptional circumstances where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights.'" (quoting *State v. Pelican*, 160 Vt. 536, 538, 632 A.2d 24, 26 (1993))). Schwarz's failure to preserve these issues, however, is raised in appellant's PCR petition as ineffective assistance of counsel. In addressing appellant's ineffective-assistance claim, we must examine the likelihood that raising these issues properly would have changed the outcome of the trial. See *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (holding that to establish ineffective assistance of counsel, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). This analysis will require us to determine whether a properly preserved claim of error would have resulted in a reversal. Therefore, we begin by considering whether the court's rulings were reversible error, and set aside the question of whether there was plain error. Finding no reversible error, we do not decide whether there was plain error.

each of the three interviews following his arrest. Instead, he argues that the circumstances surrounding his third interview rendered his statement involuntary. See *Dickerson v. United States*, 530 U.S. 428, 444 (2000) (stating that the voluntariness of confessions must be examined even after appropriate *Miranda* warnings). Involuntary confessions must be excluded, and convictions relying on involuntary confessions must be reversed. *State v. Badger*, 141 Vt. 430, 450-51, 450 A.2d 336, 348 (1982) (relying on both federal and Vermont constitutions).

■ ¶ 12. There is no question that during appellant's second interview, in his first conversation with Detectives Shortsleeve and Nelson, the detectives violated appellant's *Miranda* rights. When Detective Nelson asked appellant whether he wanted to stop talking to the detectives, and appellant responded, "Yeah," the detectives were required to end the interview immediately. *Miranda*, 384 U.S. at 473-74 ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."). The same was potentially true when appellant said, immediately prior to his request to end the interview, "You're trying to trip me up, you get an attorney in here or something." *Edwards v. Arizona*, 451 U.S. 477, 485 (1981) (holding that if the person being interrogated requests an attorney, all questioning must cease until an attorney is present). There is some dispute about the unequivocal nature of appellant's request for an attorney,[2] but we need not resolve that dispute here. Regardless of whether appellant invoked both the right to remain silent and the right to counsel or only one of those rights, *Miranda* and *Edwards* required appellant's interrogators to end the interrogation immediately when appellant told the detectives he wanted to stop talking to them. Instead, Detective Shortsleeve continued to interrogate appellant for several minutes after this invocation of the right to remain silent, thus committing a serious violation of appellant's *Miranda* rights. Had appellant confessed at that time, his confession would not have been admissible.

---

[2] In its grant of summary judgment on appellant's PCR petition, the superior court asserted that this request was not unequivocal, citing *Vail v. State*, 536 N.E.2d 302, 303 (Ind. Ct. App. 1989), and *State v. Campbell*, 367 N.W.2d 454, 459 (Minn. 1985), as cases in which similar statements were held not to have invoked the right to have counsel present during questioning.

■ ¶ 13. Whether or not appellant asserted his right to counsel is also immaterial to the question of whether interrogation could resume later, as appellant was entitled to initiate further conversation on his own in either instance. *Edwards*, 451 U.S. at 484-85 ("'[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police*." (emphasis added)); see also *Michigan v. Mosley*, 423 U.S. 96, 104 n.10 (1975) (stating that police may resume their questioning of a suspect outside the presence of counsel after the suspect's assertion of the right to remain silent). Here, appellant initiated the third interview by telling the Pennsylvania trooper he would talk to the Vermont detectives again if they stayed away from his family. It was therefore permissible for the detectives to resume the interrogation if appellant's decision to initiate the third interview was voluntary, and not the product of the coercion that took place in the tainted second interview.

¶ 14. Appellant relies on *Missouri v. Seibert*, 542 U.S. 600 (2004), to argue that the *Miranda* violation in his second interview rendered his later confession involuntary. In *Seibert*, the United States Supreme Court held that a confession was involuntary, and therefore inadmissible, despite *Miranda* warnings because police had deliberately elicited the confession before giving the warnings, then asked the defendant to repeat the confession after he was read his rights. *Id.* at 605-07. This tactic effectively stripped the later warnings of their meaning and rendered them ineffective. *Id.* at 613 ("Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent . . . ."). The plurality opinion described the relevant analysis for determining whether warnings following a *Miranda* violation are effective:

> The threshold issue . . . is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? . . . For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal

warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first . . . .

*Id.* at 611-12. The Ninth Circuit used a similar approach in *Collazo v. Estelle*, excluding a confession where, as here, police refused to end questioning after the defendant had invoked his *Miranda* rights, but reissued the *Miranda* warnings prior to the defendant's confession after the defendant had initiated a second interview. 940 F.2d 411, 413 (9th Cir. 1991). The *Collazo* court employed a four-factor test for determining the voluntariness of a confession under such circumstances, asking whether

> (1) there was a break in the stream of events sufficient to insulate the statement from the effect of the prior coercion, (2) it can be inferred that the coercive practices had a continuing effect that touched the subsequent statement, (3) the passage of time, a change in the location of the interrogation, or a change in the identity of the interrogators interrupted the effect of the coercion, and (4) the conditions that would have precluded the use of a first statement had been removed.

*Id.* at 421 (citing *United States v. Patterson*, 812 F.2d 1188, 1192 (9th Cir. 1987)).

¶ 15. We conclude that appellant's initiation of the third interview was voluntary despite the *Miranda* violation in his second interview. While, as in *Collazo*, little time passed between the interviews, and both interviews were conducted by the same officers in the same location, there was a significant "break in the stream of events sufficient to insulate [appellant's] statement from the effect of the prior coercion." *Collazo*, 940 F.2d at 421. Appellant's stated reason for initiating the third interview was to stop the police from questioning his family. He repeated this demand at the beginning of the interview and reiterated his family's lack of involvement twice before beginning to answer the detectives' questions. In the third interview, appellant gave no indication that he thought the detectives would not respect his *Miranda* rights; on the contrary, he acknowledged that he was "probably hanging myself, talking to you without a lawyer," demonstrating his understanding that he was proceeding without a lawyer by his own choice. At another point, appellant exercised his right to remain silent, refusing to speak with the detectives until they allowed him to leave the room and smoke a cigarette. In sum, unlike the defendant in *Seibert*, who believed he had already confessed prior to giving his

statement, or the defendant in *Collazo,* whose actions following the *Miranda* violation allowed an inference that his decision to confess was related to the violation, appellant understood that he was entitled to a lawyer and that he was entitled not to answer further questions, but he decided to cooperate anyway. His confession was voluntary, and it was not error for the district court to admit it.

¶ 16. This reasoning also applies to appellant's related argument that the totality of the circumstances of the second interview, aside from the aforementioned *Miranda* violation, rendered his confession in the third interview involuntary. See *State v. Bacon,* 163 Vt. 279, 294, 658 A.2d 54, 64 (1995) (in determining whether confession was voluntary, court looks to totality of the circumstances, and ultimate question is whether police conduct or tactics caused a defendant's will to be overborne and his capacity for self-determination to be critically impaired). Appellant argues that in the second interview the Vermont detectives lied to him by failing to tell him that they knew Mary had been murdered until after they had questioned him for approximately two hours, and they provided an inaccurate assessment of the physical evidence against him. In addition, appellant claims the detectives threatened him with a long prison sentence and attempted to make him think that he could avoid that sentence by confessing, and they took improper advantage of his lack of sophistication and his sensitivity about his Pennsylvania family. Appellant contends that these circumstances, among others, made his later statements involuntary, and thus, any use of his confession at trial violated his constitutional rights.

¶ 17. We need not decide whether any of the particular tactics employed by the Vermont detectives were unduly coercive; we have already determined that the detectives violated appellant's rights in the second interview. But see *id.* at 293-94, 658 A.2d at 64 (recognizing that police may use some psychological tactics in eliciting a statement from a suspect, and stating that "[e]ven if such tactics play a part in the suspect's decision to confess, the confession is voluntary so long as the decision is a product of the suspect's own balancing of competing considerations") (citation omitted). The only question we must answer is whether the tactics employed in the second interview contributed to appellant's decisions to initiate the third interview, waive his *Miranda* rights a third time, and make a confession. See *id.* at 294, 658 A.2d at 64 (explaining that question is not whether statements made by interrogators were cause of defendant's confession but rather "whether those

statements were so manipulative or coercive that they deprived defendant of his ability to make an unconstrained, autonomous decision to confess") (brackets and citation omitted). We conclude that appellant's actions were voluntary for the same reasons discussed above. If appellant had confessed in the second interview, our analysis would be quite different, but instead, he confessed in the third interview, after giving every indication that he understood his rights and was choosing not to exercise them. The totality of the circumstances surrounding the third interview does not support appellant's assertion that he was unconstitutionally coerced into confessing, and we therefore reject this claim of error.

## B.

■ ¶ 18. Appellant next contends the district court erred by admitting evidence of his prior acts of domestic violence against Mary. "We reverse trial court evidentiary rulings only when we find an abuse of that discretion resulting in prejudice." *State v. Ovitt*, 2005 VT 74, ¶ 8, 178 Vt. 605, 878 A.2d 314 (mem.). Appellant rests his argument on Vermont Rule of Evidence 404(b), which prohibits the use of prior bad acts to prove that a defendant acted consistently with a propensity for the type of behavior at issue. V.R.E. 404(b). The State argues that the two instances of domestic violence, including appellant's prior conviction, were admissible to demonstrate appellant's motive and intent under Rule 404(b), which allows evidence of prior crimes and bad acts for "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." V.R.E. 404(b). We agree. While appellant did not contest the issue of whether he had a motive to commit the crime, the State retained the burden of affirmatively proving the elements of first-degree murder, including intent to kill and premeditation. *Estelle v. McGuire*, 502 U.S. 62, 69 (1991) ("[T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense."); *State v. Couture*, 169 Vt. 222, 226, 734 A.2d 524, 527 (1999) (stating that pursuant to 13 V.S.A. § 2301, first-degree murder requires proof that killing was intentional, deliberate, and premeditated). The State's proof of intent and premeditation at trial depended in part on appellant's motive, which the State argued was to prevent Mary from calling the police. Evidence that the police knew of appellant's history of abusing Mary, and that appellant was on probation at the time of the killing for a previous act of domestic violence, was probative of appellant's motive and thus admissible under Rule 404(b).

In addition, evidence of both appellant's prior conviction and his theft of Mary's property was relevant "to portray the history surrounding the abusive relationship, providing the needed context for the behavior in issue." *State v. Sanders*, 168 Vt. 60, 62, 716 A.2d 11, 13 (1998); see also *State v. Allen*, 169 Vt. 615, 616, 738 A.2d 113, 114 (1999) (mem.) (stating that the "defendant's prior conduct and surrounding occurrences were inherently related to and provided a context for the incident"); *State v. Kelley*, 163 Vt. 325, 329, 664 A.2d 708, 710 (1995) (holding that evidence of the defendant's prior course of conduct was "necessary to explain to the jury defendant's motive for the murder" by placing "an otherwise random and bizzare act" in context). Evidence of appellant's prior bad acts helped demonstrate that appellant's relationship with Mary was deteriorating in the time leading up to Mary's death, which, in turn, was probative of appellant's motive to harm Mary. It was not error for the court to admit this evidence.

## C.

¶ 19. Appellant's final contention in his direct appeal is that the district court erred by refusing to instruct the jury on the lesser-included offense of voluntary manslaughter. "As a general rule, a criminal defendant is entitled to have the jury instructed on all lesser-included offenses." *State v. Delisle*, 162 Vt. 293, 301, 648 A.2d 632, 637 (1994). Second-degree murder and manslaughter are both lesser-included offenses of murder in the first degree. *Id.* The district court granted appellant's request for a jury charge on the lesser-included offense of second-degree murder, but it denied appellant's request for a voluntary manslaughter charge, stating that the evidence presented at trial was insufficient to support such a charge. See *id.* ("A requested charge on a lesser-included offense will be given . . . only if the facts in evidence reasonably support such an instruction."); *State v. Wright*, 154 Vt. 512, 518-19, 581 A.2d 720, 724-25 (1989) (holding that jury charge on voluntary manslaughter was not required when there was no evidence presented that supported either provocation or diminished capacity). Appellant asserts that although his defense included no evidence to support a manslaughter charge because he denied any involvement in Mary's death, the State's affirmative case contained evidence that would have allowed the jury to convict him of voluntary manslaughter.

¶ 20. We agree with appellant that the evidence was sufficient to support a voluntary manslaughter instruction, and it was error for the

court to deny the instruction. "'[V]oluntary manslaughter is an intentional killing committed under extenuating circumstances that would mitigate, but not justify, the killing, such as provocation that would cause a reasonable person to lose self control.'" *Delisle*, 162 Vt. at 301, 648 A.2d at 637-38 (alteration in original) (quoting *State v. Johnson*, 158 Vt. 508, 518 n.4, 615 A.2d 132, 138 n.4 (1992)); see also *Wright*, 154 Vt. at 518, 581 A.2d at 724-25 ("Manslaughter would have been the appropriate charge in the absence of malice — either by reason of sudden passion or great provocation or by reason of diminished capacity."). The circumstances here closely resemble the facts of *Delisle*, where we held that the trial court erred by refusing to instruct the jury on voluntary manslaughter when the defendant maintained his complete innocence at trial. *Delisle*, 162 Vt. at 301-02, 648 A.2d at 637-38. In *Delisle*,

> [t]he evidence showed that the victim and defendant were in a deteriorating love affair and the victim had threatened defendant that she had "a dark tale" to tell. In addition, the manner of death was manual strangulation. These facts could conceivably have led the jury to conclude that this was an unlawful killing committed in the heat of passion.

*Id.* at 301-02, 648 A.2d at 638. Each of these facts was also present in this case. Much of the State's evidence demonstrated that the Yohs' marriage was deteriorating, and, according to appellant's confession, he and Mary were engaged in an argument when Mary threatened to call the police with false allegations of abuse. When Mary reached for the telephone, appellant "snapped" and strangled her to death. In addition, appellant had been drinking that night, and he told Detective Shortsleeve that he could not remember what had happened because, in Detective Shortsleeve's words, appellant "blacked out." Because the State chose to present appellant's videotaped confession to the jury, each of these assertions was presented to the jury. The facts in evidence therefore reasonably supported a jury instruction on voluntary manslaughter, despite appellant's failure to take advantage of those facts in his defense strategy.

¶ 21. Although it was error for the court to refuse to instruct the jury on voluntary manslaughter, this error was harmless beyond a reasonable doubt in this case. See *State v. Trombley*, 174 Vt. 459, 462, 807 A.2d 400, 405 (2002) (mem.) (stating that an error is harmless only when we can state a belief of harmlessness beyond a reasonable doubt). While the evidence the jury heard was minimally sufficient to entitle

appellant to an instruction on voluntary manslaughter, it was highly unlikely that the jury would have chosen to convict appellant of a lesser-included offense in light of appellant's defense. First, while appellant's failure to actually argue for a lesser-included offense cannot be interpreted to preclude a jury charge on that offense, *Delisle*, 162 Vt. at 301-02, 648 A.2d at 637-38, appellant did more than simply fail to argue in favor of a manslaughter conviction. In fact, appellant's strategy was to reduce the effect of his confession, which conflicted with the Shelley Palmer story. This also meant disputing the elements of appellant's confession that would have supported a lesser-included offense. In addition, attorney Schwarz attempted, in both his cross-examination of the State's witnesses and his closing argument, to convince the jury that appellant was not drunk or angry at Mary on the night of the party at the hotel, and that the witnesses who claimed appellant seemed angry were misinterpreting his behavior. This tactic was part of an overall strategy relying on appellant's claims that someone else committed the crime. The jury was faced with a choice between the State's evidence of a premeditated first-degree murder and appellant's weakly supported allegations of a professional killing. It is hard to believe that a jury presented with those two versions of events would have disregarded both arguments and settled on a verdict supported by evidence that both sides either ignored or dismissed.

¶ 22. Without more, though, we would still reverse appellant's conviction if the jury had chosen to convict him of second-degree murder instead of first-degree murder. A jury charged on a lesser-included offense may view the evidence differently than it would without that charge. "[A] lesser-included offense instruction allows the jury to convict the defendant for criminal behavior for which there is proof beyond a reasonable doubt, without convicting on a greater offense for which proof beyond a reasonable doubt may be lacking." *State v. Alexander*, 173 Vt. 376, 383, 795 A.2d 1248, 1254 (2002). Thus, it "forces the State to meet its constitutional burden of proof *for each element of the crime*, rather than allowing the State to present the jury with a binary choice of guilty or not guilty." *Id.* As we stated in *Delisle*, "instructing the jury on the elements of lesser-included offenses ... serves to sharpen the definitions of the crimes for which the defendant can be convicted. It enables the jury to put related crimes in the proper perspective by comparing the elements of one to the others." 162 Vt. at 306, 648 A.2d at 640. Accordingly, we rejected the State's argument in *Delisle* that the lack of a manslaughter instruction was harmless

because the jury, by convicting the defendant of second-degree murder, implicitly concluded that it was inappropriate to convict him of only manslaughter. *Id.* at 307, 648 A.2d at 641. We noted that in every appeal involving a court's failure to charge a lesser-included offense the jury must have convicted the defendant of some greater offense. Thus, we concluded that "our acceptance of [the State's harmless error] argument 'would effectively negate the right to jury instructions on a lesser-included offense in every case.'" *Id.* (quoting *State v. Bolio*, 159 Vt. 250, 254, 617 A.2d 885, 887 (1992)).

¶ 23. This reasoning is somewhat less applicable where the jury is instructed on a lesser-included offense, but chooses to convict the defendant of the greater offense. In *Alexander*, the jury was not instructed on a lesser-included offense, and thus, faced a "binary choice of guilty or not guilty." 173 Vt. at 383, 795 A.2d at 1254. In *Delisle*, the defendant was convicted of second-degree murder; there was no lesser-included offense between voluntary manslaughter and the offense the jury chose. Here, presented with a choice between acquitting appellant, convicting him of second-degree murder, or convicting him of first-degree murder, the jury convicted appellant of first-degree murder. This verdict would likely have remained the same even if the court had charged the jury on voluntary manslaughter. See *Geschwendt v. Ryan*, 967 F.2d 877, 884 (3d Cir. 1992) ("[I]n cases involving offenses on a ladder, if the trial court wrongfully refuses to charge the offense at the bottom rung, that error is harmless provided the jury returns a guilty verdict for an offense higher up rather than for an intermediate offense which was also charged."); *State v. Daniels*, 2002 UT 2, ¶ 28, 40 P.3d 611 (holding that failure to instruct on a lesser-included offense is harmless error when the jury convicts the defendant of a greater offense and refuses to convict him of a lesser-included offense that is more serious than the offense not included in the jury charge); accord *State v. Abreau*, 363 So. 2d 1063, 1064 (Fla. 1978).

¶ 24. By including both first-degree murder and second-degree murder in the jury charge, the court accomplished, to some extent, the goal of "sharpen[ing] the definitions of the crimes for which the defendant can be convicted." *Delisle*, 162 Vt. at 306, 648 A.2d at 640. The charge clarified the distinction between a killing that was deliberate and premeditated and one that was not. Explaining the difference between murder and manslaughter would have helped to define the elements of each offense further, but the jury's finding that appellant's crime was deliberate and premeditated precluded a finding that there were "extenuating circumstances that would mitigate, but not justify,

the killing." See *State v. Johnson*, 158 Vt. at 518 n.4, 615 A.2d at 138 n.4 (defining voluntary manslaughter). In light of appellant's efforts to minimize the effect of any evidence that pointed toward such extenuating circumstances, a manslaughter instruction would not have altered these findings.

¶ 25. It is important to emphasize that this conclusion is possible only with the benefit of hindsight. In determining how many lesser-included offenses to charge, a trial court cannot foresee whether a jury will convict the defendant of the greatest offense charged, making it less important to instruct the jury on an additional lesser-included offense. Thus, regardless of the likely effectiveness of the defendant's strategy, the court must always grant a defendant's request for a lesser-included offense that is supported by the evidence. The court's error was serious, and it could have resulted in a reversal under slightly different circumstances, but here, it was harmless beyond a reasonable doubt. We therefore affirm appellant's conviction of first-degree murder.

## II. The PCR Petition

¶ 26. Having affirmed appellant's conviction, we now turn to his PCR petition. Appellant contends that the superior court erred by granting summary judgment to the State despite the existence of genuine issues of material fact regarding appellant's claim of ineffective assistance of counsel. See *In re Carter*, 2004 VT 21, ¶ 6, 176 Vt. 322, 848 A.2d 281 ("Summary judgment is appropriate when there are no genuine issues of material fact and, viewing the evidence in a light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law."). More specifically, appellant contends that there were genuine issues of material fact with respect to attorney Schwarz's failure to: (1) move to suppress appellant's confession; (2) request the correct jury instruction regarding the voluntariness of appellant's confession; (3) present an argument for a lesser charge or discuss the possibility of such an argument with appellant; (4) adequately argue or preserve his objection to the lack of a manslaughter jury instruction; and (5) present any evidence to "humanize" appellant at his sentencing hearing.

¶ 27. In making a claim of ineffective assistance of counsel in the context of a petition for post-conviction relief, the petitioner bears the burden of proof. Appellant was required to demonstrate that: (1) his counsel performed below an objective standard of reasonableness

according to professional norms; and (2) this substandard performance resulted in prejudice. *In re LaBounty,* 2005 VT 6, ¶ 7, 177 Vt. 635, 869 A.2d 120 (mem.). In deciding the State's motion for summary judgment, the superior court considered only the second prong of this analysis, setting aside the question of whether Schwarz's conduct fell short of professional norms until after its ruling. Accordingly, the court determined only whether appellant's defense was prejudiced, that is, whether "'counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland v. Washington,* 466 U.S. at 687). With respect to each of appellant's claims of ineffective assistance, the superior court ruled that none of Schwarz's alleged unprofessional errors resulted in prejudice to appellant's defense. We affirm each of the superior court's rulings except for its determination that there was no genuine issue of material fact with respect to Schwarz's alleged failure to discuss with appellant the possibility of an argument for a lesser charge. We therefore reverse and remand appellant's PCR petition to the superior court for further proceedings.

### A.

■ ¶ 28. Appellant first claims that Schwarz was ineffective in failing to move to suppress appellant's confession. While we question the wisdom of failing to challenge a confession that was obtained following a *Miranda* violation, we cannot question the superior court's determination that this decision did not affect the outcome of appellant's trial. A motion to suppress would have been futile because the *Miranda* violation did not result in a confession in appellant's second interview, and the confession during appellant's third interview was voluntary. *Supra,* ¶ 15.

### B.

¶ 29. Appellant next contends Schwarz's failure to request the correct jury instruction regarding the voluntariness of the confession caused him prejudice. Appellant was entitled to have the jury charged not to consider the confession unless it found the confession voluntary beyond a reasonable doubt. *State v. Caron,* 155 Vt. 492, 503, 586 A.2d 1127, 1133-34 (1990) (describing Vermont's use of the "Massachusetts rule," whereby voluntariness of a confession is determined first by the trial judge by a preponderance of the evidence, then by the jury according to a reasonable doubt standard). Instead, without objection,

the jury was charged that in considering what weight to give to appellant's statements,

> you should consider whether these statements were freely and voluntarily made without fear of threats or physical or psychological coercion or promises of reward. You may consider the situation of the conversation between the defendant and the police, including the duration of questioning, who was present, whether the defendant was warned about and understood his right to remain silent, his right to a lawyer, and that his statement could be used against him, and whether the defendant knowingly and voluntarily waived those rights. You should consider the defendant's motivation in making any statement. In short, you should give the defendant's statements just such weight as you feel they deserve under all the circumstances as you find them.

The superior court determined that "there may be a reasonable probability that the jury would not have found [appellant's] statements voluntary beyond a reasonable doubt" and "a proper charge may have triggered a different finding on voluntariness." The court nevertheless ruled that there was no prejudice from this error because the remaining evidence was sufficient to convict appellant.

¶ 30. We do not share the superior court's confidence that the jury would have found appellant guilty of first-degree murder even if it had disregarded the confession, but we agree that appellant was not prejudiced by Schwarz's error in failing to request the correct instruction. See *Caledonian-Record Publ'g Co. v. Vt. State Coll.*, 2003 VT 78, ¶ 7, 175 Vt. 438, 833 A.2d 1273 (noting that we may affirm a judgment where the correct result was reached for the wrong reason). There was no reasonable probability that the jury would have reached a different conclusion as to the voluntariness of appellant's confession if it had been charged properly. The jury heard testimony about the facts surrounding each of appellant's Pennsylvania interviews, including appellant's three separate waivers of his *Miranda* rights and the Vermont detectives' violation of appellant's *Miranda* rights at the end of the second interview. Appellant testified that he agreed to the third interview "[b]ecause of the pressure," but he continued, "I didn't want it over my family," apparently indicating that he wanted to spare his family the pressure that he was experiencing. Schwarz emphasized this

point in his closing argument, stating that appellant "simply wanted the police to leave his family in Pennsylvania alone, and so he agreed to give that final statement. He lied to the police about what he knew because he was alone, he was scared, and he felt no one wanted to hear the truth." Appellant's strategy was not to convince the jury that his confession was coerced; indeed, there was no evidence linking appellant's statement to the coercion the detectives employed in the second interview. *Supra,* ¶ 15. Instead, appellant sought to convince the jury that his statement, while voluntary, was false. The jury could have believed this argument and disbelieved appellant's incriminating statements, but it could not have concluded, even if properly instructed, that there was any doubt as to the voluntariness of the statements.

## C.

¶ 31. Appellant's third argument is that Schwarz failed to pursue an effective trial strategy. It is almost self-evident that appellant's defense strategy was doomed to fail, relying as it did on outlandish claims that conflicted with appellant's videotaped confession. The superior court ruled, however, that Schwarz had no choice but to pursue an "all-or-nothing" defense because appellant insisted on it. The court stated, correctly, that a defense attorney must abide by certain of a defendant's decisions, even if doing so is not in the defendant's best interest. See *In re Trombly,* 160 Vt. 215, 218, 627 A.2d 855, 856 (1993) (stating that the decisions of whether to testify and how to plead are to be made by the defendant); see also *State v. Tribble,* 2005 VT 132, ¶ 24, 179 Vt. 235, 892 A.2d 232 (stating that the decision of whether to pursue an insanity defense lies with the defendant). Appellant argues, however, that the superior court's underlying conclusion that appellant "was adamantly for an 'all or nothing' defense" was an impermissible finding with respect to a disputed material fact. We agree that this finding was impermissible.

¶ 32. Appellant submitted an affidavit with his opposition to summary judgment claiming that Schwarz did not discuss the likelihood of success of the various strategies available, and in particular, did not explain "what a diminished capacity defense was or whether it might be a possible defense," or "what second degree murder is or the differences between first and second degree murder, in terms of being found guilty and in terms of possible sentences." Appellant also claimed that Schwarz did not discuss the likelihood of success of an all-or-nothing defense. Meanwhile, Schwarz's deposition testimony indicated that he did not remember explaining diminished capacity or second-degree

murder to appellant, but that he "typically" would have had such a conversation with a defendant. Schwarz also indicated that he repeatedly attempted to convince appellant to plead guilty to a lesser charge and explained that the strategy of blaming the killing on Palmer was unlikely to succeed. Schwarz testified that he believed the "Palmer defense" was akin to a "slow guilty plea," but that further attempts to convince appellant to use a different strategy would harm the attorney-client relationship. This conflicting evidence from appellant and Schwarz was sufficient to create a disputed issue of material fact and remove the question of appellant's choice of strategies from consideration in a motion for summary judgment. While appellant was entitled to choose whether to pursue an all-or-nothing strategy at trial, he was also entitled to make this decision "'after full consultation with counsel.'" *In re Trombly*, 160 Vt. at 218, 627 A.2d at 856 (quoting 1 ABA Standards for Criminal Justice, The Defense Function § 4-5.2(a) (2d ed. 1980)). The question of whether such consultation took place is relevant to a determination of whether Schwarz provided effective assistance, and the court could not resolve this question without an evidentiary hearing on the merits, regardless of how credible it found Schwarz's deposition testimony. See *Fritzeen v. Trudell Consulting Eng'rs, Inc.*, 170 Vt. 632, 633, 751 A.2d 293, 296 (2000) (mem.) ("It is not the function of the trial court to find facts on a motion for summary judgment, even if the record appears to lean strongly in one direction.").

■ ¶ 33. The State argues, as it did in its motion for summary judgment, that the superior court could have nevertheless concluded that there was no prejudice from Schwarz's choice of strategies. Such a ruling would have strained belief. The record in this case contains sufficient evidence to support an argument for second-degree murder or voluntary manslaughter, and there is no telling how a jury would have weighed that evidence if it was presented in place of the Shelley Palmer story. We therefore reverse the superior court's grant of summary judgment with respect to this claim of ineffective assistance of counsel and remand appellant's PCR petition to the superior court for an evidentiary hearing on the issue of whether Schwarz's advice to appellant prior to trial was sufficient to allow him to make an informed choice of trial strategies.

## D.

¶ 34. Appellant next contends that Schwarz was ineffective in failing to preserve appellant's objection to the district court's refusal to charge the jury on voluntary manslaughter. Because we have already held that this error was harmless in light of appellant's defense strategy and the jury's guilty verdict on the top charge of first-degree murder, *supra*, ¶¶ 19-21, we affirm the superior court's ruling that the failure to preserve the objection did not prejudice appellant's defense.

## E.

¶ 35. Appellant's final contention is that Schwarz failed to present "humanizing evidence" to the district court in his sentencing hearing. We do not reach this argument because appellant also raises, for the first time in a motion following oral argument, the question of whether his sentence was unconstitutional in light of our holding in *State v. Provost*, 2005 VT 134, 179 Vt. 337, 896 A.2d 55. In *Provost*, we held that facts not proven to the jury beyond a reasonable doubt could not be used to increase a first-degree murder sentence beyond the presumptive sentence of life with a minimum term of thirty-five years. *Id.* ¶ 15. Appellant's sentence was enhanced through the same procedure we held unconstitutional in *Provost*, and we must therefore remand to the district court for further sentencing proceedings.

¶ 36. Appellant is entitled to the benefit of developments in the law while his case is pending on direct appeal. *State v. Gibney*, 2005 VT 3, ¶ 5, 177 Vt. 633, 869 A.2d 118 (mem.). This principle, however, is subject to ordinary rules regarding the raising and preservation of objections. See *United States v. Booker*, 543 U.S. 220, 268 (2005) (stating that not every appeal based on an opinion invalidating federal sentencing guidelines would result in resentencing "because we expect reviewing courts to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test"). Our rules require a party to raise and preserve all objections at trial, and we do not ordinarily consider issues not raised below. See *Ovitt*, 2005 VT 74, ¶¶ 13-14 (refusing to consider sentencing issue that was not properly raised and preserved below). Similarly, we will not generally consider an issue that has not been included in a party's first appellate brief. *State v. Percy*, 156 Vt. 468, 481 n.7, 595 A.2d 248, 255 n.7 (1990). When an issue has been forfeited through a party's failure to raise it below or brief it on appeal, we may consider it only under the rubric of plain error. See *Oscarson*, 2004 VT

4, ¶ 27 (reviewing claim not raised at trial for plain error only). Thus, because appellant did not object to the district court's sentencing procedure or raise the issue in his first appellate brief, we must consider his claim according to a plain-error standard.

 ¶ 37. While most of our cases regarding plain error arise from situations where appellate counsel briefs an issue not preserved below, plain error is also applicable when appellate counsel fails to raise an issue, or raises it in an untimely fashion. See V.R.Cr.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *State v. Savo*, 139 Vt. 644, 646, 433 A.2d 292, 293 (1981) (considering sufficiency of evidence under plain-error standard despite the defendant's failure to raise the issue in his brief); *State v. Trombley*, 136 Vt. 333, 335, 388 A.2d 433, 435 (1978) (stating that we could consider an issue raised below, but not briefed, only under the plain-error rule); see also *Silber v. United States*, 370 U.S. 717, 717-18 (1962) (reversing the defendant's conviction based on a plain error that was not briefed or argued before the court of appeals or the Supreme Court); 3B C. Wright et al., Federal Practice & Procedure § 856, at 513 (3d ed. 2004) (stating that plain error is usually raised by appellate counsel who "discover what they consider to be an error to which no objection was taken below. The rule is not so limited, however, and the appellate court may take notice of an error on its own motion though it is never put forward by counsel.").

¶ 38. Since the United States Supreme Court held, in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), that sentences relying on facts not found by a jury beyond a reasonable doubt violate the Sixth Amendment, appellate courts have faced precisely the same circumstances as those before us. These courts have generally employed plain-error analysis to consider untimely claims of error. See, e.g., *United States v. Cernobyl*, 255 F.3d 1215, 1218 (10th Cir. 2001) (allowing supplemental briefing and reviewing sentence for plain error where *Apprendi* issued following notice of appeal); *United States v. Delgado*, 256 F.3d 264, 280 (5th Cir. 2001) (reviewing sentencing decision for plain error where the issue was first raised in a supplemental brief following *Apprendi*); *United States v. White*, 238 F.3d 537, 541 (4th Cir. 2001) (permitting supplemental briefing after the Supreme Court's decision in *Apprendi*, and reviewing sentencing decision for plain error); *United States v. Mietus*, 237 F.3d 866, 875 (7th Cir. 2001) (reviewing sentencing

decision for plain error where *Apprendi* issued after the defendant filed his original brief and the issue was not raised until five days before oral argument); *United States v. Page*, 232 F.3d 536, 542-43 (6th Cir. 2000) (reviewing sentencing decision for plain error where the defendant failed to object at sentencing and *Apprendi* issued during the pendency of his direct appeal). But see *United States v. Ardley*, 273 F.3d 991, 991-92 (11th Cir. 2001) (en banc) (upholding panel's refusal to consider the defendant's sentencing appeal in light of *Apprendi* based on the Eleventh Circuit's absolute rule requiring all issues to be raised in parties' opening briefs).

¶ 39. Plain-error analysis requires us to consider whether these are "exceptional circumstances where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." *Oscarson*, 2004 VT 4, ¶ 27 (quotations omitted). The United States Supreme Court formulated a more concrete federal plain-error test in *United States v. Olano*, 507 U.S. 725 (1993). First, there must be an error; second, the error must be obvious; and third, it must affect substantial rights and result in prejudice to the defendant. *Olano*, 507 U.S. at 734. If these three criteria are satisfied, an appellate court "should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* at 736 (alteration in original) (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

¶ 40. Using the *Olano* test as a guide for applying our own plain-error standard, we hold that the district court's sentencing decision was plain error. After the jury convicted appellant of first-degree murder, the district court conducted a weighing of aggravating and mitigating factors pursuant to 13 V.S.A. § 2303. The court found multiple aggravating factors, including the "particularly brutal and cruel" nature of the murder, 13 V.S.A. § 2303(d)(5), and no significant mitigating factors. The court found that the aggravating factors outweighed the mitigating factors and sentenced appellant to a term of life in prison without the possibility of parole. This was the same procedure we held unconstitutional in *Provost*, 2005 VT 134, ¶¶ 14-15, and it produced the same outcome. Thus, the court's use of this sentencing procedure was error, and the error is obvious.[3]

---

[3] We note that this error was not one the district court could have avoided, considering that the sentencing hearing occurred in April 2000, several months prior to the

¶ 41. The error was also one that affected appellant's substantial rights and resulted in prejudice. *Olano*, 507 U.S. at 734; see also *Oscarson*, 2004 VT 4, ¶ 27 (stating that reversal for plain error requires "not only that the error seriously affected substantial rights, but also that it had an unfair prejudicial impact"). *Provost* relied on the United States Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296, 303-04 (2004), which held that increasing a defendant's sentence based on facts not found beyond a reasonable doubt by a jury violates the Sixth Amendment to the federal Constitution. The *Blakely* Court stated that the jury-trial right implicated in its decision "is no mere procedural formality, but a fundamental reservation of power in our constitutional structure." *Id.* at 305-06. Thus, there is no doubt that a *Blakely* error affects a defendant's substantial rights. Our decision in *Provost* also makes clear that such an error, in the context of § 2303, is always prejudicial. We held in *Provost* that because the statute requires the sentencing judge to weigh any aggravating factors against the applicable mitigating factors in § 2303(e), even a sentence based on aggravating factors admitted by the defendant or implied by the jury's verdict would violate the Sixth Amendment. 2005 VT 134, ¶¶ 18-19. Under those circumstances, while the Sixth Amendment would not require the jury to find the aggravating factors, it would require the jury to determine whether those factors outweighed any mitigating factors. *Id.* ¶ 19. Appellant's sentencing error thus "affected the outcome of the [trial] court proceedings" and satisfies *Olano*'s prejudice requirement. 507 U.S. at 734.

¶ 42. We must now consider whether the error implicates "the fairness, integrity or public reputation of judicial proceedings." *Id.* at 736 (quotations omitted). We conclude that it would be both unfair to appellant and harmful to the public reputation of Vermont's justice system to allow appellant's sentence to stand under these circumstances. It is certainly true that appellant forfeited his objection to the district court's sentencing procedure several times in the course of this

United States Supreme Court's decision in *Apprendi*, which first signaled the possibility that judicial fact-finding in sentencing was unconstitutional. The timing of the court's decision, however, is not relevant to our plain-error analysis. "[W]here the law at the time of trial was settled and clearly contrary to the law at the time of appeal — it is enough that an error be 'plain' at the time of appellate consideration." *Johnson v. United States*, 520 U.S. 461, 468 (1997).

appeal, but this is always the case in plain-error appeals. Appellant's failure to raise his objection is more excusable than usual here, where the law at the time of his sentencing proceeding provided no basis for an objection. At the time of the filing of his first appellate brief, in November 2000, *Apprendi* had recently signaled a shift in Sixth Amendment law, but it was still not obvious that there was a reasonable argument for vacating appellant's sentence, since the statutory maximum in § 2303 could have been interpreted as either life imprisonment without parole or life with a minimum term of thirty-five years. *Blakely* contained a clearer definition of the statutory maximum for *Apprendi* purposes, and this definition led directly to our decision in *Provost.* See *Provost*, 2005 VT 134, ¶ 15 (relying exclusively on *Blakely's* clarification of *Apprendi* to determine that the statutory maximum was life with a minimum term of thirty-five years). *Blakely* issued in 2004, however, well after the briefs were filed in appellant's direct appeal. Although it might have been helpful to our review if appellant had raised his claim of error prior to oral argument, oral argument is not necessary regarding this issue in light of *Provost.* It would be unacceptably harsh for us to ignore an obvious and substantial error for a lapse that has had no discernible effect on our consideration of this appeal, especially when doing so would essentially punish appellant for his appellate attorney's misstep. See 3B C. Wright et al., *supra*, § 856, at 513 ("[T]he plain error rule is a departure from the position usually presupposed by the adversary system that a party must look to his counsel to protect him and that he must bear the cost of the mistakes of his counsel.").

■ ¶ 43. The State argues that disregarding the district court's error would not be unfair to appellant because his direct appeal is still pending only because of his own efforts to consolidate his direct appeal and his PCR petition. The procedural matters that have delayed our consideration of appellant's direct appeal are not relevant. It is a fact of appellate review that certain appeals take longer than others to resolve. Our retroactivity rule strikes a balance between finality and fairness by applying decisions retroactively only to cases on direct appeal. *Gibney*, 2005 VT 3, ¶ 5. We have not previously adopted, nor shall we in this case, an exception to this rule for unusually lengthy direct appeals. Our sole concern must be whether it is necessary, in the interests of justice, to excuse appellant's failure to raise his valid and substantial claim of error in a timely fashion. Our plain-error analysis indicates that it is. We thus vacate appellant's sentence.

¶ 44. Since our decision in *Provost,* the Legislature has amended the sentencing procedures of § 2303. 2005, No. 119 (Adj. Sess.), § 2. The new statute contains procedures that apply under these specific circumstances. *Id.* (amending § 2303 such that new subsections (b)-(f) apply "if the murder was committed before the effective date of this act, and ... the defendant's sentence was stricken and remanded for resentencing pursuant to [*Provost*]"). We thus remand to the district court for further sentencing proceedings, although we express no opinion as to the constitutionality of the newly enacted procedures. As we also remand appellant's PCR petition to the superior court, *supra,* ¶ 31, appellant's new sentence will remain subject to the superior court's decision on remand as to whether appellant is entitled to post-conviction relief.

*Appellant's conviction is affirmed. Appellant's sentence is vacated and the case is remanded to the district court for further proceedings consistent with the views expressed herein. Summary judgment regarding appellant's petition for post-conviction relief is affirmed in part, reversed in part, and remanded to the superior court for further proceedings consistent with the views expressed herein.*