James A. DORSEY, Appellant,

v.

UNITED STATES, Appellee.

No. 06–CF–1099.

District of Columbia Court of Appeals.

Argued May 19, 2009.

Decided Aug. 19, 2010.

sion during the second phase of the interrogation; and (2) whether the trial court properly determined that, before the second phase of interrogation, he knowingly and intelligently, and voluntarily waived his rights under *Edwards*.[1] We affirm the judgment of the trial court.

## FACTUAL SUMMARY

Mikel–Meredith Weidman, Public Defender Service, with whom James Klein and Samia Fam, were on the brief, for appellant.

Elizabeth H. Danello, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Mary B. McCord, and Jonathan Haray, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, GLICKMAN and THOMPSON, Associate Judges.

REID, Associate Judge:

The government concedes that during the first phase of police interrogation of appellant, James A. Dorsey, "the police violated the prophylactic rule articulated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)" by not stopping the interrogation when Mr. Dorsey invoked his right to counsel after having initially waived his *Miranda* rights. This case requires us to determine, primarily, (1) whether Mr. Dorsey initiated conversation with the police that resulted in his confes-

The record shows that Mr. Dorsey's conviction was based on his May 3, 2005 assault and robbery of Vassiliki Fotopoulous, an 83–year–old limited English-speaking street vendor, who sold merchandise outside a subway station located in the Northwest quadrant of the District of Columbia. As Ms. Fotopoulous proceeded to her nearby apartment house while pushing a cart containing her vending items, Mr. Dorsey struck her and she fell to the ground. When she would not give him her money, Mr. Dorsey kicked her several times, causing "excruciating pain," and he removed about $300 from her person. Ms. Fotopoulous did not recall all of the details of the assault but remembered both seeing her children at the hospital and being in a lot of pain, especially "excruciating pain" in her leg. Theodora Kunec, Ms. Fotopoulous's daughter, testified that she saw her mother in the emergency room of the hospital on May 3, 2005. Her mother's "eyes were swollen and ... blue"; her face was swollen; "the whole body had blood everywhere"—nose, mouth; "her head had bumps all over"; "she was moaning, and she was in horrible pain." Four persons identified Mr. Dorsey as the perpetrator after viewing a surveillance tape depicting

1. A jury convicted Mr. Dorsey of aggravated assault while armed (shod foot), in violation of D.C.Code §§ 22–404.01, 22–4502 (2001), and armed robbery of a senior citizen, in violation of D.C.Code §§ 22–2801, 22–4502, 22–3601(a) (2001). The trial court sentenced him to concurrent terms of fourteen years for each offense, followed by five years of supervised release.

the attack.[2]

After Mr. Dorsey's arrest on another charge on May 7, 2005, he waived his *Miranda* rights at about 8:30 p.m., and the police interrogated him about the attack and robbery of Ms. Fotopoulous. Parenthetically, the record shows that Mr. Dorsey is a high school graduate, worked at a liquor store, had ten prior convictions, and has been arrested on more than thirty occasions. Mr. Dorsey spent approximately twelve or thirteen hours in the interview or interrogation room—from Saturday evening, May 7, until about 8:30 or 9:00 a.m. the next morning. He sat alone for several hours of that time.[3] During this first phase of the police interview, several members of the Metropolitan Police Department ("MPD") interrogated Mr. Dorsey. They ignored his repeated efforts to terminate the interrogation, specifically his statements that he wanted to tell his story in court; he wished to go to his cell so he could sleep; he needed to talk to a lawyer; he was waiting to be charged; and he did not want to talk. Despite the officers'

persistence in posing questions to him and their rigorous interrogation using tactics designed to persuade a suspect to talk and to confess, Mr. Dorsey never made a statement that implicated himself in the crimes committed against Ms. Fotopoulous. The officers took him to a cell around 8:30 a.m. on May 8.

According to the testimony of Detective Michael Ross, an apparently unidentified officer heard Mr. Dorsey banging on his cell in the afternoon around 3:30 or 4:30 p.m. "At some point, a detective overheard [Mr. Dorsey] say that he wanted to speak to Detective Ross, that he wanted to confess." Mr. Dorsey was returned to an interview or interrogation room. As he sat there, MPD Officer Joseph Crespo, whom he knew, passed by. According to Officer Crespo's testimony, Mr. Dorsey said: "Crespo, come here, I want to talk to you about what I did. I did it." This encounter between Officer Crespo and Mr. Dorsey was not videotaped. Officer Crespo asserted that he was not aware of how long Mr. Dorsey had been interrogated

2. Ondria Jeter, who lived in the area where Ms. Fotopoulous was attacked, was acquainted with Mr. Dorsey, had seen him over the past ten years, and had spoken with him in a neighboring park. When she saw the televised surveillance tape, she recognized Mr. Dorsey by his clothing (including skull cap), backpack, shoes, and walk. She was "95, 96 percent sure that [it was] [Mr. Dorsey]." Richard Harrison, who worked at a club in the area, had been accustomed to seeing Mr. Dorsey for the past five to seven years because Mr. Dorsey loitered outside the club "every day" and asked for money. He knew Mr. Dorsey as "Jimmy," and recognized him on the videotape by his walk, looks and mannerisms. He stated that Mr. Dorsey normally wore a black skull cap and carried a backpack. Dino Demetro (and his wife) owned a business in the area. He, too, identified the man on the televised surveillance tape as Mr. Dorsey, who was known to him as "Jimmy." He knew it was Mr. Dorsey from "his body language," that is, "the way he walks[,] [t]he

way he moves." Mr. Dorsey had performed "odd jobs" for Mr. Demetro over the past four or five years. Mr. Dorsey wore the same outfit daily, consisting of Army or camouflage pants and he carried a backpack every day. Andrew Goss, a liquor sales representative, sold liquor to retail establishments in the area where Ms. Fotopoulous was attacked. He also knew Mr. Dorsey as "Jimmy," and recognized him on the televised surveillance tape by "[t]he certain way he carried himself[,] [t]he way he walked." He consistently wore black, and had a "do rag" for his head.

3. The record includes eight DVDs of the interrogation, seven of which pertained to the first phase of the interrogation. Mr. Dorsey notes that "[t]he recording of the overnight interrogation is just over thirteen hours long." The government estimates that "[o]ut of the 12 hours between the time he waived his rights at 8:25 p.m. and the time the first interview ended at 8:21 a.m., Mr. Dorsey was alone for approximately nine hours."

before he arrived for work on May 8, 2005. Nor did he know whether Mr. Dorsey "had waived or invoked" his right to counsel.

Nevertheless, Officer Crespo and Sergeant James T. Young, who was scheduled to question Mr. Dorsey that afternoon, interviewed Mr. Dorsey together. They did not reiterate the *Miranda* warnings. The DVD of the second phase of the interrogation shows Mr. Dorsey handcuffed to a chair and Officers Crespo and Young seated at the table with him. As the recording began, Officer Crespo told Mr. Dorsey:

> As I walked by just now you called out to me. You obviously said you wanted to talk about this. O.K.? We are going to want for you to be specific. We want you to tell us the story first. Tell us exactly what happened. Then we have some questions for you. So tell us what happened.

When Officer Crespo declared, "[y]ou obviously said you wanted to talk about this," Mr. Dorsey did not respond either verbally or by body movement to signify yes or no; he simply sat there.

Once Officer Crespo finished his remarks, Mr. Dorsey began to talk about the incident, without hesitation. About a week before the attack on Ms. Fotopoulous, Mr. Dorsey had asked her to change a $20 bill but she told him to get away from her vending stand. On the day of the attack, a man, who apparently had witnessed the earlier exchange, asked Mr. Dorsey why he had let Ms. Fotopoulous treat him that way. Mr. Dorsey then approached Ms. Fotopoulous and asked her for money. She rebuffed him. He walked down the street, waited for her, and asked for money when she appeared. When she failed to hand over her money, he shoved her to the ground, and kicked her before taking her money. Mr. Dorsey demonstrated how he assaulted and took money from Ms. Foto-

poulous. Officer Crespo pressed for more details, saying "you've admitted it; it's not going to get worse." Mr. Dorsey provided more details and he stated several times that he did not know the woman he assaulted and robbed was "that old." Eventually, the officers ceased their questioning so that Mr. Dorsey could eat and smoke a cigarette.

After more questions following Mr. Dorsey's meal, Officer Crespo commented that he has known Mr. Dorsey "for a long time" and "appreciate[d] Mr. Dorsey's talking to [him and Officer Young]." Just before his bathroom break, Mr. Dorsey said he did not "want a lot of charges," and that he would "take the robbery" charge. Officer Crespo responded, in part: "Unfortunately, I'm not in charge of what happens to you. My job is to go get you.... That's not my job to determine what happens to you." Mr. Dorsey reiterated that he did not "need a whole lot of charges" and that he would "take the robbery plea."

## ANALYSIS

Mr. Dorsey challenges the trial court's admission of his videotaped confession into evidence; he claims that despite his explicit request to speak to a lawyer, the government failed to scrupulously honor that request. Instead, he maintains, the police continued to badger him and tried to extract a confession during the first day and night of questioning. He contends that his request to speak with detectives on the second day cannot be regarded as an "initiation" under *Edwards,* because "a suspect cannot be said to have validly 'initiated' contact with police when he asks to speak with them after they have violated *Edwards* by badgering him to confess."

The government "agree[s] that the police violated the prophylactic rule of *Miranda* . . ., and *Edwards* . . ., when, in the

first phase of their interrogation, they questioned [Mr. Dorsey] after he asserted his rights." But the government insists that Mr. Dorsey's "decision to renew the conversation [with the police] and confess did not result from any police coercion" since "[t]he police had not engaged in oppressive conduct overbearing [Mr. Dorsey's] will." In addition, the government contends, "any improper pressure had dissipated by the time of the second interview," and Mr. Dorsey confessed "because he felt remorse and wanted to 'get it off [his] chest.'"

Contrary to the government's argument, Mr. Dorsey asserts that "the detectives' constitutionally improper conduct 'played the dominant role' in eliciting [his] confession," and that the real reason he decided to speak with the detectives the following day was not remorse. Rather, "he decided to talk because [Detective] Crespo promised him leniency—an incentive that aligned with the advice that he should plead guilty to ensure that it would be a 'straight robbery' and the threat that refusing to talk would result in greater charges."

The trial court determined that "there [was] a significant break in the questioning" when Mr. Dorsey was taken to "a different location" (a cell) so that he could sleep. The court credited the testimony of Officers Ross and Crespo about Mr. Dorsey's initiation of contact with the police after he had slept, and discredited the assertions of Mr. Dorsey that he did not ask to talk to the police on the afternoon of May 8, and that he confessed because Officer Crespo said he would help him out. The judge specifically found Officer Crespo to be a "very credible witness," and noted that Mr. Dorsey did not say that Officer Crespo incorrectly stated that he, Mr. Dorsey, wanted to talk. The court reasoned that Mr. Dorsey decided to con-

fess because "he wanted to get it off his chest and he didn't know that lady was so old." Thus, the trial court did not "find that there is any suggestion or any evidence that [Mr. Dorsey] didn't initiate the conversation after he went to the cell and went to sleep." The court observed that Mr. Dorsey had "knowledge of the [c]riminal justice system" and "knew about a waiver" of his rights due to his past arrests and convictions. The court saw no "hint of coercion, force, intimidation, psychological whipping or anything else in viewing [the] videotape [of the confession]." Hence, the trial court concluded that Mr. Dorsey "initiated the contact and he voluntarily and knowingly and intelligently waived his right to remain silent and have a lawyer present because his testimony supported that as well as his demeanor."

This appeal requires us to decide whether Mr. Dorsey initiated conversation with the police on the afternoon of May 8 and whether, having invoked his right to counsel during the first phase of police interrogation, he knowingly and intelligently waived his right to counsel during the second phase of police questioning. "The trial court's underlying factual findings . . . are reviewed under the 'clearly erroneous' standard, and they will only be set aside if they lack substantial support in the record." *Morris v. United States*, 728 A.2d 1210, 1215 (D.C.1999) (citations omitted). However, we review the trial court's legal conclusions *de novo. See Robinson v. United States*, 928 A.2d 717, 725 (D.C. 2007).

In reviewing the initiation and waiver issues, we are guided by legal principles distilled from *Edwards, supra,* and other cases. *Edwards* held, in part, that a suspect who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by

the authorities until counsel has been made available to him, unless the [suspect] himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484–85, 101 S.Ct. 1880; *see also Jennings v. United States*, 989 A.2d 1106, 1113 (D.C.2010). The "fundamental purpose [of the *Edwards/Miranda* prophylactic rule] is to [p]reserv[e] the integrity of an accused's choice to communicate with police only through counsel, by prevent[ing] police from badgering a defendant into waiving his previously asserted *Miranda* rights." [4] *Maryland v. Shatzer*, ––– U.S. –––, 130 S.Ct. 1213, 1220, ––– L.Ed.2d ––– (2010) (internal quotation marks and citations omitted; first alteration added); *see also Morris*, 728 A.2d at 1226 (Terry, J., concurring in part and dissenting in part). If the suspect "initiate[s] the meeting [with the police], nothing in the Fifth ... Amendment[ ] would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial." *Edwards*, 451 U.S. at 485, 101 S.Ct. 1880.

■ *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), held that a court must apply a two-part test to determine whether a suspect's responses to police questions after he has invoked his right to counsel, nevertheless may be admitted into evidence. First, the court must determine whether the suspect initiated the subsequent conversation with the police. The defendant initiates the conversation where his words "evince[ ] a willingness and a desire for a generalized discussion about the investigation." *Bradshaw*, 462 U.S. at 1045–46, 103 S.Ct. 2830. Second, because initiation does not

"amount to a waiver of a previously invoked right to counsel," *id.* at 1044, 103 S.Ct. 2830, the court must determine whether the government met its "burden ... to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation," *id.* at 1044–45, 103 S.Ct. 2830 (referencing *Edwards*, 451 U.S. at 486 n. 9, 101 S.Ct. 1880). "This inquiry, of course, also includes an examination of the voluntariness of the waiver." *United States v. Straker*, 596 F.Supp.2d 80, 95 (D.D.C.2009) (citations omitted). Thus, the waiver determination " 'depends upon the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.' " *Id.* (quoting *Bradshaw*, 462 U.S. at 1046, 103 S.Ct. 2830) (alteration in original).

■ There is no doubt on this record, as the parties recognize, that Mr. Dorsey invoked his right to counsel during the first phase of police interrogation, and that the police improperly ignored his request. Thus, the critical questions are whether Mr. Dorsey subsequently initiated conversation with the police on the afternoon of May 8, and whether he knowingly and intelligently, and voluntarily, waived his Fifth Amendment right to have an attorney present during the second phase of police interrogation.

■ We begin our analysis with a threshold matter. Mr. Dorsey insists that "initiation" is impossible in this case since he invoked his right to counsel during the first phase of the interrogation. As he

---

4. As the Court said in *Minnick v. Mississippi*, 498 U.S. 146, 151, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990):

The rule ensures that any statement made in subsequent interrogation is not the result of coercive pressures. *Edwards* conserves judicial resources which would otherwise be expended in making difficult determina-. tions of voluntariness, and implements the protections of *Miranda* in practical and straight-forward terms.

states in his reply brief: "Mr. Dorsey does not challenge the trial court's finding that he knocked on the cellblock door and asked to speak to Detective Ross. Rather, Mr. Dorsey contends that his request could not qualify as an 'initiation' under *Edwards*, because *Edwards* does not make its initiation exception available after police have violated *Edwards*." He invites us to "adopt the reasoning of Judge Kozinski's concurrence in *Collazo v. Estelle*, 940 F.2d 411 (9th Cir.1991) (en banc), and hold that the initiation 'escape hatch' is unavailable when police refuse to cease an interrogation after a request for counsel and badger the defendant to give up his rights." We decline to adopt that reasoning because we do not believe that Fifth Amendment jurisprudence supports what we understand to be Mr. Dorsey's argument—that the prophylactic rule announced by *Edwards/Miranda* means that once a defendant invokes his right to counsel and police continue their interrogation, he cannot thereafter validly initiate a conversation with the police. *Edwards* did not announce such an absolute prohibition; nor does Mr. Dorsey call our attention to any cases which have adopted this type of categorical bar with respect to initiation by a defendant.[5]

Indeed, as the government asserts, the "categorical rule" which Mr. Dorsey advocates "is undermined by the number of cases where courts have upheld the admission of defendant-initiated statements despite the fact that the police, in an earlier interview, failed to respect the defendant's invocation of rights." *See, e.g., Howard v. Moore*, 131 F.3d 399, 412–14 (4th Cir.1997) (en banc); *State v. Yoh*, 180 Vt. 317, 910 A.2d 853, 860–62 (2006). Furthermore, we do not believe that the *Edwards* rule was designed to end any possibility of a voluntary confession after a defendant invokes his right to counsel under the Fifth Amendment, which the police ignore. Without voluntary confessions, any number of crimes could not be resolved, and hence there would be "substantial costs to the truth-seeking process and the criminal justice system." *Montejo v. Louisiana*, — U.S. ——, 129 S.Ct. 2079, 2091, 173 L.Ed.2d 955 (2009) (citations omitted). In short, we reject Mr. Dorsey's threshold argument, and since he has not challenged the trial court's finding that he initiated conversation with Detective Ross on the afternoon of May 8, we proceed to determine whether he knowingly and intelligently waived his Fifth Amendment right to counsel before he confessed, and whether the waiver was voluntary.

■■■ The question whether Mr. Dorsey knowingly and intelligently waived his Fifth Amendment right to counsel before he confessed, and whether any waiver was

---

5. *State v. Beaupre*, 123 N.H. 155, 459 A.2d 233 (1983), *United States v. Whaley*, 13 F.3d 963 (6th Cir.1994), and *Metcalf v. State*, 284 Ark. 223, 681 S.W.2d 344 (1984), cases cited by Mr. Dorsey, do not impose the categorical, *per se* initiation rule advocated by Mr. Dorsey. *Beaupre* did not involve initiation by a defendant; rather, it concerned a defendant's response to an "invitation" or a "request" by a detective "for the defendant to make a statement," 459 A.2d at 235. *Whaley* raised the question, whether a defendant's conversation three weeks prior to interrogation constituted an initiation—a question the court did not decide since defendant did not ask to speak to the police on the day he confessed in response to police-initiated questions, 13 F.3d at 968. And, the defendant in *Metcalf* did not initiate contact with the police on the morning he was removed from his cell and taken to the interrogation room, 681 S.W.2d at 345. *Wilson v. United States*, 444 A.2d 25 (D.C.1982), one of our precedents on which Mr. Dorsey leans, does not help him with respect to his *per se* rule against initiation. That opinion contained no facts on which the court could determine whether Mr. Wilson had initiated conversation with the police; nor did the case seek to address a *per se* initiation rule of the type advocated here.

voluntary, gives us some pause, particularly since the police did not reiterate the *Miranda* warnings before posing questions to Mr. Dorsey on the afternoon of May 8.[6] The burden to demonstrate a knowing and intelligent, and voluntary waiver rests with the government. *Bradshaw*, 462 U.S. at 1044–45, 103 S.Ct. 2830. To examine this issue, we look at " 'the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.' " *Id.* at 1046, 103 S.Ct. 2830 (quoting *Edwards, supra,* 451 U.S. at 486 n. 9, 101 S.Ct. 1880). That is, we focus on "the particular facts and circumstances surrounding [this] case, including the background, experience, and conduct of the accused."[7] *Id.* at 1046, 103

---

**6.** The government observes in its brief that our cases appear to conflict concerning our standard of review of the waiver issue; that is, whether it is deferential because it is a question of fact, or whether we review the issue *de novo* because it is a question of law. *Compare Robinson, supra,* 928 A.2d at 725 ("[W]e review the trial court's legal conclusions [on the voluntariness of the waiver] *de novo.*") (citing *In re M.A.C.,* 761 A.2d 32, 38 (D.C.2000) (internal quotation marks and other citation omitted; second alteration in original)), with *Dean v. United States,* 938 A.2d 751, 763–64 (D.C.2007) ("Whether a suspect voluntarily waived his *Miranda* rights is an issue of fact to which this court defers to the trial court's finding unless it is without substantial support in the evidence or plainly wrong."). We interpret our cases as recognizing that the waiver issue may involve both factual and legal questions. As we said in *In re M.A.C., supra:*

> If there is substantial evidence in the record to support the trial court's factual findings of a knowing, voluntary, and intelligent waiver of *Miranda* rights, we uphold them. However, we review the trial court's legal conclusions *de novo.* The ultimate issue of voluntariness is a legal question.

761 A.2d at 38 (internal quotation marks and citations omitted).

**7.** In *People v. Neal,* 31 Cal.4th 63, 1 Cal. Rptr.3d 650, 72 P.3d 280 (2003), defendant initiated conversation with the police on the morning after the first interrogation. At trial, the detective who conducted the interrogation on both the first and second days "admitted that [during the first day of interrogation] he intentionally continued interrogation in deliberate violation of *Miranda* in spite of defendant's invocation of both his right to remain silent and right to counsel ..., 'probably' '7 to 10 times.' " *Id.,* 1 Cal.Rptr.3d 650, 72 P.3d at 286. In addition, the detective threatened defendant with the "heavie[st] charge"—"first degree murder or whatever[,]" if he did not "cooperate" with the police. 1 Cal.Rptr.3d 650, 72 P.3d at 285. After the first day of interrogation, defendant was placed in a cell under deplorable conditions (including no access to a toilet). *Id.,* 1 Cal.Rptr.3d 650, 72 P.3d at 286. On the morning of the second day, defendant asked to speak with the same detective who had interrogated him on the first day; he confessed during two interviews by the detective. *Id.,* 1 Cal.Rptr.3d 650, 72 P.3d at 286–87. The court articulated three reasons for concluding that defendant's confessions should have been suppressed on grounds that his initiation of the second interview and his confessions were not voluntary: (1) "in the course of the first interview, [the detective] intentionally continued interrogation in deliberate violation of *Miranda* in spite of defendant's repeated invocation of both his right to remain silent and right to counsel," *id.,* 1 Cal.Rptr.3d 650, 72 P.3d at 291; (2) defendant's age (18), his minimal education ("fail[ure] to graduate even from continuation high school"), his "background ... of thoroughgoing neglect if not abuse," his low intelligence, and his lack of "extensive" experience "with respect to legal matters," *id.,* 1 Cal.Rptr.3d 650, 72 P.3d at 292; and (3) the detective's "[p]romise and threats to defendant at the first interview," *id.* In contrast to the defendant in *Neal,* Mr. Dorsey had both a high school education and extensive experience with the criminal justice system and, as Judge Thompson's concurring opinion substantiates, he knew how to deflect the questions of those who interrogated him, both when he chose not to respond on the first day of interrogation, and when he corrected the police detectives on the second day as they mentioned incorrect information. Furthermore, Mr. Dorsey was not threatened in the manner of the *Neal* defendant; nor was he promised any leniency in exchange for his confession. And, unlike the *Neal* defendant,

S.Ct. 2830 (internal quotation marks and citations omitted). We are convinced on this record that "the failure of [the police] to provide [Mr. Dorsey] with new *Miranda* warnings impacts only slightly on the validity of his waiver of the right to counsel, because only a [relatively] short time had passed between [his] receiving the *Miranda* warning and [his] requesting to speak with [Detective Ross and Officer Crespo]," *United States v. Velasquez*, 885 F.2d 1076, 1087 (3d Cir.1989), and because the waiver is supported by the "totality of the circumstances."

Here, Mr. Dorsey initially waived his *Miranda* rights but then invoked his right to counsel during the first phase of interrogation, thus showing that he was aware of his right to counsel. At that time, he not only had substantial experience with the criminal justice system due to his multiple arrests and ten prior convictions, but as a high school graduate he was able to read, write and understand the English language. During the second phase of police questioning, Mr. Dorsey further demonstrated his awareness of his rights through a comment to Officer Crespo after the break in questioning following his confession. He stated to Officer Crespo: "I know y'all [did not have a] case on me. I could have probably gone to court and beat it anyway." What undoubtedly motivated Mr. Dorsey to initiate the conversation with the police and to confess, as the trial court found, was his remorse at having hit an elderly woman. As Mr. Dorsey remarked at least four times during his conversation with Officers Crespo and Young,

he did not know the victim was "that old." He also recalled that he had "never [before] robbed a woman in [his] life." Hence, we have no doubt that Mr. Dorsey knowingly and intelligently waived his right to counsel before he confessed. We turn now to whether his waiver was voluntary.

■ Mr. Dorsey's initiation of conversation with the police on May 8, which he concedes is part of our "totality of the circumstances" analysis, contributed to the voluntariness of his waiver. *Bradshaw, supra*, 462 U.S. at 1046, 103 S.Ct. 2830. The trial court explicitly credited the testimony of Detective Ross and Officer Crespo that Mr. Dorsey, not the police, initiated the conversation, and the court expressly discredited Mr. Dorsey's testimony that he did not initiate the conversation with the police. The trial court found credible Detective Ross's testimony that while Mr. Dorsey was still in his cell around 3:30 or 4:00 p.m. in the afternoon, an officer heard him ask to speak with Detective Ross and heard him say "that he wanted to confess." Mr. Dorsey was taken to an interview room to wait for Detective Ross. While he was there, Officer Crespo passed by and Mr. Dorsey called out to him that he wanted to speak with the officer "about what I did." There is no ambiguity in Mr. Dorsey's words. Clearly his words at least "evinced a willingness and a desire for a generalized discussion about the investigation" into the robbery of Ms. Fotopoulous. *Brad-*

Mr. Dorsey did not ask for and was not interrogated on the second day by Detective Thompson who clearly had violated his *Edwards/Miranda* rights on the first day of interrogation. Although Mr. Dorsey initially asked for Detective Ross, that detective did not question him on the second day, and had sought to safeguard Mr. Dorsey's right to counsel on the first day of interrogation (but

the trial court found that Detective Ross had ignored one unambiguous assertion by Mr. Dorsey of the right to remain silent). Significantly, on the second day Mr. Dorsey also asked to speak with Detective Crespo (the trial court found him to be a "very credible witness"), and the second day of interrogation was conducted only by Officers Crespo and Young.

*shaw, supra,* 462 U.S. at 1045–46, 103 S.Ct. 2830. Significantly, when Officer Crespo said to Mr. Dorsey, before asking any questions during the second phase of the police interview, "you called out to me" and "[y]ou obviously said you wanted to talk about this," Mr. Dorsey did not protest or deny that he made a request to talk to Officer Crespo. After Officer Crespo invited Mr. Dorsey to recount what happened, Mr. Dorsey again did not protest or indicate that Officer Crespo mistakenly concluded he wanted to talk. Rather, Mr. Dorsey waived his right to counsel as he began to describe his encounter with Ms. Fotopoulous the week before he attacked her, and then provided details about how he attacked and robbed her.

We are unpersuaded by Mr. Dorsey's contention that "the initiation in this case must be understood as the 'delayed product' of the unconstitutional interrogation that preceded it." [8] Nothing in this record

8. Our dissenting colleague labels this matter as "the most egregious case of police disobedience to the requirements of *Miranda* and *Edwards*" that he has seen since joining the bench. His outrage is misplaced. He belabors what the government and the majority readily have acknowledged—that the police violated Mr. Dorsey's rights during the first phase of the interrogation, but he virtually ignores the trial court's findings and credibility determinations, as well as Mr. Dorsey's actions and words concerning the second phase. Moreover, he approaches the question of waiver in a formalistic manner. Yet, Justice Kennedy, speaking for the majority in *Berghuis v. Thompkins,* —— U.S. ——, 130 S.Ct. 2250, —— L.Ed.2d —— (2010) declared, in part:

The prosecution does not need to show that a waiver of *Miranda* rights was express. An "implicit waiver" of the "right to remain silent" is sufficient to admit a suspect's statement into evidence, [*North Carolina v.*] *Butler,* [441 U.S. 369] 376 [99 S.Ct. 1755, 60 L.Ed.2d 286 (2010)]. *Butler* made clear that a waiver of *Miranda* rights may be implied through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." 441 U.S., at 373 [99 S.Ct. 1755].... Although *Miranda* imposes on the police a rule that is both formalistic and practical when it prevents them from interrogating suspects without first providing them with a *Miranda* warning, ... it does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights. As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.... As *Butler* recognized, 441 U.S. at 375–76 [99 S.Ct. 1755], *Miranda* rights can therefore be waived through means less formal than a typical waiver on the record in a courtroom, ... given the practical constraints and necessities of interrogation and the fact that *Miranda's* main protection lies in advising defendants of their rights.... *Berghuis,* 130 S.Ct. at 2261–62 (other citations omitted). Our dissenting colleague's conclusion that Mr. Dorsey confessed only as a result of the impact of the first phase of interrogation rings hollow on this record in light not only of the trial court's recognition of Mr. Dorsey's considerable experience with the criminal justice system and his obvious knowledge of his rights, but also Mr. Dorsey's conduct of first remaining silent and then starting to speak when Officer Crespo said to him at the very beginning of the second phase, "you called out to me. You obviously said you wanted to talk about this. O.K.?" In addition, after his confession, as we have noted, Mr. Dorsey made a statement that indicates he knew his rights when he confessed: "I know y'all [did not have a] case on me. I could have probably gone to court and beat it any way." Even though our dissenting colleague resists the notion that Mr. Dorsey freely, intelligently and deliberately confessed to the vicious and painful beating of Ms. Fotopoulous out of remorse (because he did not know she was "that old"), the trial court so found, and the court further concluded, as the videotape establishes, that Mr. Dorsey confessed during the second phase of interrogation without any "hint of coercion, force, intimidation, psychological whipping or anything else...." On this record, our conclusion that Mr. Dorsey implicitly and deliber-

convinces us that Mr. Dorsey succumbed to psychological pressure to speak to the police and to confess. I fully agree with and I join Judge Thompson's concurring opinion. In response to the dissent's presentation of a detailed examination of the first day of interrogation, Judge Thompson (1) details how Mr. Dorsey ably resisted police efforts to extract a confession on the first day of interrogation; and (2) demonstrates that Mr. Dorsey voluntarily initiated conversation with the police, and "his actions" were not "tainted by the detectives' failure to honor scrupulously [his] invocation of his right to counsel."

Mr. Dorsey revealed on May 7 and in the early hours of May 8 that, despite alcohol withdrawal symptoms, he could not be pressured into confessing even though the police used well-known psychological tactics designed to elicit a confession. Significantly, there is no evidence that the police used physical coercion or threats of physical punishment that prompted Mr. Dorsey to give in and confess on May 8. In fact, the trial court specifically found that there was not "any hint of coercion, force, intimidation, [or] psychological whipping" that prompted Mr. Dorsey's confession.[9] A more plausible explanation of his deci-

sion to initiate conversation with the police and to confess is the significant break in interrogation that allowed Mr. Dorsey to sleep and to reflect. After the break, he made a conscious choice to speak with the police about his crimes against Ms. Fotopoulous. On the particular facts and circumstances of this case, as revealed in the record, we see no danger that the "fundamental purpose [of the *Miranda/Edwards* prophylactic rule]" will be violated, because we are satisfied that "police ... badgering" [did not] prompt Mr. Dorsey "[to] waiv[e] his previously asserted *Miranda* rights." *Shatzer*, 130 S.Ct. at 1220.

In sum, in light of our review of the record, the trial court's credibility determinations and its factual findings, Mr. Dorsey's substantial experience with the criminal justice system, his high school education, his obvious knowledge that he had a right to an attorney (which he had invoked during phase one of the interrogation), and his initiation of his conversation with the police on May 8, we have no doubt that the trial court was correct in concluding, based on the totality of the circumstances, that Mr. Dorsey knowingly

ately waived his *Miranda* and *Edwards* rights intelligently, knowingly and voluntarily before confessing is consistent with the principles articulated in *Berghuis*.

**9.** Mr. Dorsey leans heavily on *Collazo, supra,* in an effort to support his argument that he did not make a knowing, intelligent and voluntary waiver of his right to counsel, and hence, that his confession was not voluntary. The factual circumstances in *Collazo* are not the same as in this case, and as *Bradshaw* makes clear—the waiver determination "depends upon the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *Id.* at 1046, 103 S.Ct. 2830. The record in *Collazo* substantiated the appellant's claims that "he was scared, and that [the police interrogator's] threats [were] what

caused him to change his mind and talk without counsel." 940 F.2d at 421. Mr. Dorsey never voiced fear of his interrogators and there is no indication in the record of any police threats that prompted him to initiate conversation and to confess. In addition, unlike Mr. Dorsey's case, only three hours elapsed between the first phase of interrogation in *Collazo* and the appellant's decision to talk. *Id.* at 420. Moreover, in *Collazo*, the interrogators in the second phase began by linking it to the first phase. *Id.* at 422. Here, Officer Crespo did not mention the first phase of police questioning as he began the afternoon session following Mr. Dorsey's initiation of the conversation. Thus, Mr. Dorsey's case is not like *Collazo* where there was "unmistakable evidence that no break in the causal chain or stream of events had occurred." *Id.* at 422.

and intelligently waived his right to counsel. For the same reasons, we are satisfied that the trial court was correct in asserting that Mr. Dorsey's confession was voluntary, that is, it was the "product of a free and deliberate choice rather than intimidation." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). *See also Bradshaw,* 462 U.S. at 1044–46, 103 S.Ct. 2830; *Jennings, supra,* 989 A.2d at 1113–14.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.[10]

*So ordered.*

THOMPSON, Associate Judge, concurring:

I join Judge Reid's thoughtful and careful opinion. I write separately to explain why—having viewed in their entirety the over thirteen hours of DVDs of Mr. Dorsey in the interrogation room, and being fully mindful of our measure of review, *see ante* at 227—I am satisfied with Judge

Reid's conclusion that Mr. Dorsey's confession was voluntary.

I agree with Judge Reid that Mr. Dorsey demonstrated throughout his ordeal, from about 7:20 p.m. on May 7 until about 9:15 a.m. on May 8, that he could not be pressured into confession through the tactics that the detectives used. Mr. Dorsey, who acknowledged early in the interrogation that he had "been around the block a couple times" in the criminal justice system, held his own throughout the detectives' questioning, appearing to be unintimidated, observing detachedly at one point that Detective Ross was "trying everything in the book," responding to Detective Ross's description of evidence that would show that Mr. Dorsey was lying by telling the detective, "You're playing with me," and explaining that he wanted his case to go to court so that the detectives would "stop messing with me."[1] Mr. Dorsey repeatedly stated that he would go to court and that he didn't really care if he lost at trial and went to jail. From the (eight) DVDs, it appears that what Mr. Dorsey found uncomfortable was not the question-

---

**10.** We are unpersuaded by Mr. Dorsey's argument that the trial court abused its discretion by not permitting Dr. Richard Leo to present expert testimony on the specific techniques that police officers use to elicit confessions and the phenomenon or psychology of false confessions. According to the defense proffer, police techniques and false confessions are "part of two larger scientific areas known as social psychology and criminology." Dr. Leo would have "explain[ed] the relation of social psychology to criminology." He would also have demonstrated that police techniques may coerce individuals to confess falsely. As we have reiterated repeatedly, "[t]he trial judge has wide latitude in the admission or exclusion of expert testimony, and his decision with respect thereto should be sustained unless it is manifestly erroneous." *In re Melton,* 597 A.2d 892, 897 (D.C.1991) (en banc) (internal quotation marks and citation omitted). "Reversals for abuse are rare." *Id.* (internal quotation marks and citation omitted). The trial court carefully considered the

pleadings of the government and the defense on this issue. It determined that the "factors and conditions" that Dr. Leo would discuss "are the same factors and conditions that jurors traditionally consider in evaluating challenges to custodial statements by individuals suspected of having committed a criminal offense." In addition, the trial court stated that "the proffered testimony does not take into account an evaluation of the defendant, the proffered testimony is of minimal probative value, and under these circumstances would most likely interject confusion into the trial and the deliberating process." On this record, we conclude that the trial court's ruling is not "manifestly erroneous." *Melton,* 597 A.2d at 897.

**1.** In addition, after Mr. Dorsey had confessed, he made a comment to Detective Crespo about the detectives' having "said all that bullsh*t[,]" and then said "I've been in the system and all. I know."

ing[2] or the detectives' claims about the evidence they were building against him, but his inability to lie down to sleep. During the several hours when he was left alone in the interrogation room, he sometimes maneuvered to the floor and lay there, arm raised and still handcuffed to the chair in which he had been sitting. His discomfort at those times, and as he tried to sleep while sitting up in the unforgiving chair, is palpable. But, notwithstanding the discomfort, throughout the night Mr. Dorsey showed no inclination at all to confess or to initiate a conversation with the detectives to end his ordeal. At no point on any of the eight DVDs does it appear that Mr. Dorsey was worn down, or that his will was overborne.

Mr. Dorsey unambiguously invoked his right to counsel when, alone in the interview room with Detective Thompson at nearly 3 a.m.,[3] he told the detective, "I need to talk to a lawyer now" and "I don't want to talk no more. I'm not saying nothing else." Undeniably, the continued questioning that followed, and the continued coercion of sitting handcuffed or lying down on the floor while still shackled all night in the interrogation room,[4] were a "flagrant breach of the prophylactic rules established by the Supreme Court in *Miranda* and its progeny...." *Collazo v. Estelle*, 940 F.2d 411, 419 (9th Cir.1991) (en banc). But, as Judge Reid notes, we have

not recognized a categorical rule that a defendant cannot be said to have initiated contact with police if, previously, police have continued questioning him despite his invocation of his *Miranda* rights. *Cf. Riley v. United States*, 923 A.2d 868, 884, 885 n. 17 (D.C.2007). Rather, we have asked whether any taint from the detectives' failure to honor scrupulously the defendant's invocation of his rights "was dissipated by the lengthy break." *Id.* at 885 n. 17. Accordingly, our task here is to determine whether Mr. Dorsey's request to speak with detectives on the afternoon of May 8 and his subsequent confession were voluntary (and entailed an implicit waiver of his rights), or whether instead his actions were involuntary in the sense that they were tainted by the detectives' failure to honor scrupulously Mr. Dorsey's invocation of his right to counsel. The law requires "exclusion of evidence tainted by the violation" of Mr. Dorsey's invocation of his right to have counsel present during the interrogation. *Burno v. United States*, 953 A.2d 1095, 1106 (D.C.2008) (Ruiz, J., concurring).

Thus, our analysis must focus on what interrogation followed Mr. Dorsey's invocation of his right to counsel and whether the effects of that interrogation are reflected in his later actions toward and statements to police.[5] And, here, it is

2. Albeit with slight exaggeration, the government has it about right in arguing that the detectives' tone throughout the questioning was "unfailingly polite and conversational."

3. Detective Ross had left the interview room shortly after 2:00 a.m., telling Mr. Dorsey that it was "time for you to get some rest."

4. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (explaining that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those nor-

mally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect").

5. *Cf. Stewart v. United States*, 668 A.2d 857, 866, 867 (D.C.1995) (reasoning that where Detective Treadwell, Stewart's fellow church member, spoke to Stewart in his cell after Stewart had invoked his right to remain silent and asked Stewart whether he would be willing to speak to the detective later in the day, Stewart's statements to Detective Treadwell eight hours later when he asked to speak to the detective were inadmissible, because

important to describe the interrogation carefully. In terms of duration and effect on Mr. Dorsey's demeanor, the major form of interrogation that followed Mr. Dorsey's invocation of his right to counsel was the hours he spent alone in the interview room, handcuffed to his chair and thus unable to lie down to sleep comfortably, after Detective Thompson had departed the interrogation room (some time after ‹3:00 a.m.). But, by the time Mr. Dorsey initiated the discussion with the detectives on the afternoon of May 8, he had had an opportunity to sleep in lockup. He testified that he was not intimidated by being in a jail cell and that no one bothered him while he was in lockup. On DVD number 8, the recording of the confession he made after he asked to speak again with detectives, Mr. Dorsey looks refreshed and energetic. I am persuaded that the coercive impact of Mr. Dorsey's silent overnight ordeal had dissipated by that time.[6]

What also transpired after Mr. Dorsey invoked his right to counsel were periods of questioning, immediately after he said he needed a lawyer and again hours later, just before he was taken to lockup. The first period of questioning spans ten transcript pages.[7] Detective Thompson told Mr. Dorsey that "only a fool" would want a judge to see all the evidence against him, and that he ought to call his mother and ask her to pray for him to "set [his] conscience straight...." Seemingly unaffected, Mr. Dorsey responded repeatedly, "I'm going to go to court." Detective Thomp-

son next suggested that Mr. Dorsey should think about how, by confessing and going to jail, he could "get [his] medical stuff squared away" and get things off his chest. In response, Mr. Dorsey muttered something to the effect of "the hell with it." Next, Detective Thompson asked Mr. Dorsey whether his mother had ever been robbed, and Mr. Dorsey said, "No." Detective Thompson then told Mr. Dorsey that there were two sides to every story and that he wanted to give Mr. Dorsey a chance to tell his side. Mr. Dorsey said that he "want[ed] to lay down and go to sleep."

There was no more questioning until Detective Ross returned at about 8 a.m. on May 8. This questioning, which spanned the time period just before Mr. Dorsey was taken to lockup, covers twelve transcript pages. Detective Ross showed Mr. Dorsey the return for a warrant to search Mr. Dorsey's rented room and asked whether Mr. Dorsey "still want[ed] to stay with [his] story." Detective Ross accused Mr. Dorsey of lying to the detectives about having stayed in a shelter, told him that his whole story was falling apart, told him that he needed to tell the truth and express remorse and say that he didn't mean to hurt the victim, suggested that he could attribute his mistake to needing drug treatment, and urged that Mr. Dorsey didn't want to "roll the dice on something like this." Mr. Dorsey responded that he "didn't do nothing." Detective Ross told Mr. Dorsey that he had found the person

Stewart acted "in response to Detective Treadwell's invitation during the improper interrogation at the cellblock").

**6.** *Cf. Holland v. McGinnis,* 963 F.2d 1044, 1051 (7th Cir.1992) (reasoning that the approximately six hours that passed between the defendant's mistreatment and his confession and the difference in treatment accorded him by his subsequent interrogators had provided a "meaningful interlude" that permitted the

threat of physical mistreatment to "fade[ ] considerably in the interim," and concluding that even though the contamination from the earlier interrogation had not completely disappeared, the "break in the stream of events" meant that the contamination was not sufficient to render the confession involuntary).

**7.** The transcript of the questioning up to that point covers almost 170 transcript pages.

who had driven by in a white car while the robbery was going on. An unidentified detective asked Mr. Dorsey whether he thought that police would fail to "put all this together" and asked him "what happened?" Mr. Dorsey responded that the detective would "hear it in the courtroom," declining the detective's request for "a small scenario" of what Mr. Dorsey's "story[ ] was going to be. Just after Detective Ross stepped out of the room, Mr. Dorsey told the unidentified detective, "I don't want to talk. I'm ready to go to sleep." Detective Thompson told Mr. Dorsey that "[t]he sh*t is backing up" and said something about "trying to help [Mr. Dorsey] out."

It is on that record of interrogation that we must consider whether Mr. Dorsey's initiation of further discussion and his confession on the afternoon of May 8 bore any taint from the detectives' failure to honor scrupulously Mr. Dorsey's invocation of his right to counsel. I begin by observing that the trial judge's description of Mr. Dorsey is apt: during the interrogation shown on DVD number 8, Mr. Dorsey "was talking just as matter [of] factly and just as plain and just as undisturbed as anybody I have ever [seen]."[8] He gave a detailed and expansive account and repeatedly cooperated in dramatizing how he hit Mrs. Fotopoulous and took her money. He quoted the people whom he mentioned in his account of what happened, and he asked the detectives to clarify their questions.

Significantly, Mr. Dorsey did not merely parrot the detectives' suggestions. To the contrary, he repeatedly disagreed with or declined to adopt detectives' suggestions that he had a glove or sock or something else on his hands when he robbed Mrs. Fotopoulous, that Mrs. Fotopoulous had a "pouch," that he could have done "something else in that alley that you don't remember," and that he sustained injuries during the robbery. He said that he did not know the color of a car that drove by just before the robbery even though the detectives had told him repeatedly about a white car that was in the area. Asked whether the man who showed him where Mrs. Fotopoulous lived had a beard or a moustache, Mr. Dorsey rejected those choices and responded that the man "had plaits in his hair."[9] Mr. Dorsey made no reference to the evidence that police had against him (saying, instead, that he knew that police did not have a case on him), and no reference to anything that police might have found in a search of his room, taking advantage of the medical care in jail, or being high on drugs, as the detectives had urged. Mr. Dorsey answered "Yeah" when detectives asked whether he felt remorseful, and he said he felt "bad" when detectives asked, "How do you feel about what happened?," but he did not mention on his own the "remorse" and "conscience" clearing that detectives had suggested. Rather, he said repeatedly, that he didn't know the lady was "that old," that he had never before robbed a woman, and that he had not planned to hit the victim.[10] And, although Mr. Dorsey did say that he had been drinking the day of the robbery,

**8.** Unlike the defendant in *Collazo*, Mr. Dorsey did not "testif[y] he was scared" into confessing. 940 F.2d at 421.

**9.** In short, Mr. Dorsey's responses were not "mere supine attempts to give the desired response to leading questions." *Lyons v. Oklahoma*, 322 U.S. 596, 605, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944).

**10.** Mr. Dorsey also talked repeatedly about "get[ting] it off my chest." He thus used words similar to those Detective Thompson had used after Mr. Dorsey said he needed a lawyer. But Detective Thompson had also used this language before Mr. Dorsey invoked his right to counsel, saying "Any decent person would want to get this off their chest, would you agree?"

there is no reason to think that this was at the detectives' urging either, since, early in his May 7 interrogation, he told the detectives repeatedly that he was an alcoholic and drank "every day." In addition, he told the detectives that he knew that it was not their job to determine what charges would be brought against him.

I note, moreover, that when Mr. Dorsey initiated the conversation with detectives on the afternoon of May 8, he asked to speak with Detective Ross. Mr. Dorsey also called out to Detective Crespo, saying that he wanted to speak with him. It was Detective Ross, the lead detective, who advised Mr. Dorsey of his *Miranda* rights when the interrogation began on the evening of May 7. It was also Detective Ross, who, at a later point in the May 7 interrogation, with Detective Crespo present, told Mr. Dorsey that "I have to stop talking to you" if Mr. Dorsey requested a lawyer, and who sought clarification that Mr. Dorsey was "willing to still talk to me." Thus, Mr. Dorsey asked to speak to the detective who had acknowledged an obligation to

honor Mr. Dorsey's rights.[11] With Detective Ross being unavailable, Mr. Dorsey actually spoke with Detective Young (who had not participated at all in the earlier rounds of questioning) and Detective Crespo.[12] Neither Ross nor Young nor Crespo had been present when Mr. Dorsey unambiguously (but to no avail) said that he needed to speak with a lawyer, and all three denied having been told that Mr. Dorsey invoked his right to counsel.[13] Further, Detective Crespo had known Mr. Dorsey for about ten years and Mr. Dorsey agreed that the two had had a relationship of mutual respect. I am unpersuaded that Mr. Dorsey's experience taught him that these detectives could not be trusted to honor his rights.

Finally, the tactics that the detectives used in this case do not even come close to the "questionable mode of psychological pressure"—officers' telling the defendant that his mother and grandmother had been arrested as a result of the discovery of contraband in their house and that he needed to confess so that his mother and

---

In addition, during his confession Mr. Dorsey said, "If that would have happened to my mother, man. . . ." This was a theme that Detective Thompson pursued after Mr. Dorsey invoked his right to counsel, but it was also a theme that Detective Ross had pursued before Mr. Dorsey invoked his rights (asking, "Your wouldn't want to see anything happen to your mother, would you? . . . . So you don't think that's somebody's mother?").

11. To be sure, during his interrogation of Mr. Dorsey, Detective Ross did deflect many statements and questions from Mr. Dorsey about "[j]ust go[ing] to court" and about when he would be taken to lockup so that he could sleep. Detective Ross testified that he did not regard these statements as an invocation of the right to remain silent, and as to some of the statements, the trial judge agreed. *Cf. DeWeaver v. Runnels*, 556 F.3d 995, 1000, 1002 (9th Cir.2009) (holding that "[t]he state appellate court could properly conclude . . . that a reasonable officer in the circumstances would not have understood [defendant's] re-

quest [to be "taken back to jail"] to be an invocation of the right to silence"). But the court found that Detective Ross had continued to question Mr. Dorsey after one such statement that the trial judge determined to be an unambiguous statement that Mr. Dorsey did not want to talk any more and wanted to terminate the interrogation ("go back there to sleep. . . . Take me back there.") In contrast, Mr. Dorsey told Detective Thompson, "I don't want to talk no more. I'm not saying nothing else"—words that the parties agree were unequivocal.

12. There was thus a "change in the identity of the interrogators [that] interrupted the effect of the [prior] coercion. . . ." *Collazo*, 940 F.2d at 421.

13. For this and other reasons, I see no basis to conclude broadly, as Mr. Dorsey argues, that police "affirmatively and deliberately set out on a course to show Mr. Dorsey that his rights were a nullity. . . ."

grandmother would be released—involved in *Brisbon v. United States*, 957 A.2d 931, 946–47 (D.C.2008), that led us to say that the question of the voluntariness of the defendant's confession was a "close one." *Id.* at 949.

Given all of the foregoing, I am satisfied that there was a qualitative "break in the stream of events sufficient to insulate" Mr. Dorsey's confession from "the effect of the prior coercion,"[14] and that Mr. Dorsey's initiation of a further discussion or his confession was not tainted by the detectives' improper conduct after he had invoked his right to counsel. I cannot say that Detectives Young and Crespo, to whom Mr. Dorsey confessed, were "beneficiaries of the pressure applied"[15] by earlier interrogators after Mr. Dorsey invoked his right to counsel.[16] I find it much more plausible that Mr. Dorsey acted with the benefit of a long break from contact with the detectives, rest, and time for reflection.[17]

GLICKMAN, Associate Judge, dissenting:

This is the most egregious case of police disobedience to the requirements of *Miranda*[1] and *Edwards*[2] that I recall coming before this court during my years on the bench. During a thirteen-hour, overnight custodial interrogation, a tag team of detectives (1) subjected appellant to sleep deprivation, verbal harassment, and physical discomfort; (2) ignored his numerous attempts to assert his Fifth Amendment rights to cut off the questioning and to have a lawyer present; (3) advised appellant that his best hope would be to confess, link his behavior to his drinking, show remorse, and plead guilty to a reduced charge of simple robbery; and (4) told appellant they would keep on questioning him after they allowed him to get a few hours of sleep. When appellant at last gave in, the detectives promptly resumed his interrogation (5) without re-advising appellant of his Fifth Amendment rights or informing him that now, unlike before, they would permit him to exercise those rights; and (6) without ascertaining whether appellant would agree to waive his rights if the detectives were prepared to honor them and proceed without counsel. Echoing the script the detectives had laid out for him, appellant then confessed,

14. *Collazo*, 940 F.2d at 421; *cf. Riley*, 923 A.2d at 885 n. 17 (describing the court's satisfaction that the taint from a detective's improper remarks to the defendant after the defendant had invoked his right to remain silent was "dissipated" by a lengthy break even though "we cannot totally eliminate the possibility that [the detective] solicited" the defendant's initiation of a conversation with detectives).

15. *Miranda v. Arizona*, 384 U.S. 436, 497, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

16. I note also that many of the interrogation techniques that the detectives used after Mr. Dorsey had invoked his *Miranda* rights (such as accusations that he was lying, descriptions of the mounting evidence against Mr. Dorsey, and warnings about going to court and "roll[ing] the dice") were ones that detectives

had also used early during the interrogation, before he invoked. Thus, even if the coercive effect of the detectives' techniques was not completely eliminated by the afternoon of May 8, it would be difficult to conclude that any remaining effect was from post-invocation interrogation.

17. *Cf. Chavez v. State*, 832 So.2d 730, 749 (Fla.2002) (per curiam) (concluding that confession was voluntary where, among other things, long interrogation was followed by "a six-hour rest period," time during which defendant "was left alone for quiet reflection").

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

linked his behavior to his drinking, expressed remorse, and said he would take the robbery charge.

All agree that the police violated *Miranda* and *Edwards* by continuing to badger appellant to confess after he asserted his Fifth Amendment rights. It is an understatement to say the detectives did not "scrupulously honor" appellant's rights to cut off questioning and to have counsel present during his interrogation. My colleagues nonetheless conclude that the government met its burden of showing that appellant "initiated" the resumption of his interrogation after he at last was permitted to sleep for a few hours, and that appellant validly waived his Fifth Amendment rights before he confessed. I dissent from that conclusion. In my opinion, there was no genuine "initiation" for purposes of *Edwards* because appellant was not given a choice; rather, he was made to understand that his interrogation would continue indefinitely after he awoke and that his requests for counsel would not be honored. What the government calls an initiation by appellant was merely his capitulation. And in my opinion, there was no valid waiver as required by *Miranda*. Appellant could not have waived his Fifth Amendment rights knowingly, intelligently and voluntarily because the detectives made him understand that, on this occasion, those rights were inoperative. There can be no valid waiver of rights by one who is not allowed to exercise them.

## I. The Overnight Interrogation

In order to determine whether appellant initiated the resumption of his interrogation and validly waived his rights, I consider it imperative not to gloss over the details of his treatment by the police. It is possible to recount those details with accu-racy because appellant's interrogations were videotaped.

Appellant was arrested at about 7:00 p.m. on Saturday, May 7, 2005, brought to the Second District police station, and placed in an interrogation room. He remained in that room for thirteen hours, from around 7:25 p.m. Saturday night to 8:25 a.m. Sunday morning. He spent much of that time alone, seated in the chair to which he was handcuffed or trying to lie down on the floor to rest as fatigue and alcohol withdrawal symptoms took their toll. At intervals throughout the night and early morning, several detectives took turns interrogating him. The bulk of appellant's interrogation took place roughly from 8:20 to 10:20 p.m.; 1:45 to 2:10 a.m.; 2:25 to 3:00 a.m.; and 8:05 to 8:20 a.m.

### A. The Inception: Appellant Waives His Rights and Agrees to Answer Questions—About A Different Alleged Offense

Appellant was arrested initially for an alleged assault on his girlfriend, not for the robbery of Ms. Fotopoulous in Foggy Bottom. Detectives Ross and Tabron did not mention that robbery when they advised appellant of his *Miranda* rights, nor for some time thereafter. Appellant read through the standard PD–47 waiver-of-rights card, commented that he was "used to" it,[3] and agreed to answer the detectives' questions without a lawyer present. Over the next two hours, Detective Ross questioned appellant persistently about his whereabouts at the time of the robbery (which, coincidentally, was close in time to the assault on appellant's girlfriend). Appellant steadfastly denied having been in Foggy Bottom, however, even when Ross told him witnesses had seen him there, showed him a surveillance photograph of a

---

**3.** Appellant had been arrested over thirty times before and had ten prior convictions.

man who looked like him, and said his DNA had been found in the vicinity of the photograph. Ross repeatedly accused appellant of lying. When Ross observed that appellant was sweating, appellant explained that he was an alcoholic and had not had anything to drink.

At one point, the two detectives left the room.[4] While they were out, Detective Crespo came in and chatted with appellant for a few minutes. Crespo reminded appellant how he had helped him in the past and stated that "if there's somebody that you're going to talk to, I hope it would be me." Crespo added that he and appellant had a "mutual respect," and "I honestly think you made a mistake. I honestly think that if you're going to try to feel better about what's probably going on in your head, if there's someone you're going to talk to, it should be me."

## B. Appellant Asserts His Right to Terminate the Interrogation—to No Avail

Detective Ross returned to the interrogation room at about 9:30 p.m. He warned appellant that he was "getting ready to go at [him] hard," and he did just that. Over the next half hour, Ross pressed appellant to admit he had been in the Foggy Bottom area. Ross yelled and spoke loudly and repeatedly accused appellant of lying. He also noted again that appellant was sweating and shaking. Appellant responded that the detective's questions were "crazy." Eventually he told Ross just to lock him up and bring his supposed witnesses to court.

Around 10 p.m., Ross accused appellant of having robbed a woman in the Foggy Bottom area. This was the first mention during the interrogation of the robbery of Ms. Fotopoulous. Saying he could prove appellant's involvement in the robbery through DNA and fingerprint evidence, Ross invited appellant to tell him his "version of what happened." Within a minute, appellant said, "Let's go to court.... I don't know what you talking about." Over the next hour or so, Ross tried to persuade appellant to confess, and appellant insisted that he did not know what Ross was talking about. In addition, appellant reiterated over and over that he just wanted to go to court, that he was tired, and that he wanted to be returned to the cellblock and allowed to sleep. Ross did not stop interrogating appellant, however. He told appellant that his DNA would be obtained from the tissues he had used to wipe the sweat from his forehead; repeated that they needed to have "closure"; urged appellant to tell him "his side" of the story; warned him that "the wall's closing in" and that it was time for appellant to do the right thing; said going to court would serve no purpose; and asked appellant if he really wanted to go into a courtroom, face the evidence, and "roll the dice." Several times Ross left the interrogation room and returned. He explained he was "building a house" of evidence against appellant and that each time he left, he was getting "some more bricks." In response to one of those remarks, at approximately 11:15 p.m., appellant asked to "go back [to the cellblock] to sleep. Take me back now. Take me back there and put me [indiscer-

---

4. The detectives left the interrogation room after appellant said he would submit to a DNA test only if he could "get a lawyer." When Ross returned, he confirmed that appellant was not invoking his right to counsel during the interrogation ("If you're saying you want a lawyer, I'll stop right now, I'll walk out the door. But we want to get to the bottom of this. You're saying if—to take a DNA test, you want a lawyer, is that what you're saying?"). Appellant does not contend that he had made an unequivocal invocation of his Fifth Amendment right to counsel by this point.

nible]." The trial court found that appellant unambiguously asserted his right to remain silent and cut off the questioning.

## C. "Shaking Like a Leaf"

The interrogation continued. Ross left the room briefly, telling appellant to "[l]ay back in the chair and relax" because he would have "a minute to sleep." Upon his return, Ross discovered that appellant had urinated on himself. The detective took appellant's clothing and gave him a paper jumpsuit to wear. Appellant asked to keep his shirt because it would be cold in the cellblock, but Ross denied the request. After seizing the clothing, Ross told appellant to wait because he had "to go out, build some bricks." Appellant again asked to be taken back to the cellblock so he could get sleep. Ross offered to let him lie down on the ground in the interrogation room, handcuffed to his chair, but appellant repeated that he wanted to go back to his cell. Ross commented that appellant was "shaking like a leaf." Ross asked appellant if he wanted to talk to him; appellant said no (three times), adding that he did not care whether Ross "ke[pt] on building."

For most of the next two-and-a-half hours, appellant was left alone in the interrogation room. He spent some of that time lying on the floor, handcuffed to his chair, and some of it sitting up in the chair.

## D. Detective Thompson Takes Over; Appellant Resists Further Questioning

At about 2:00 a.m., Ross returned with Detective Thompson. Ross told appellant there were "a couple more things we need to talk to you about," after which appellant could "get a little sleep." Detective Thompson then took over, questioning appellant about matters already covered by Ross. By this point, appellant was visibly tired and was mumbling his answers. When Thompson pressed appellant about the lies he allegedly had told, appellant responded, "I didn't say that. . . . I don't want to talk about it." After further questions, appellant stated, "Take me back . . . go to sleep now. Take me in the back, lock me up." The detectives continued to question appellant, saying that anyone would want to get the crime "off their chest." Dorsey answered, "Let me do it when I go to court." Again, appellant asked to "go to sleep."

## E. "We'll Take a Run at This Tomorrow After You Get a Few Hours Sleep"

Eventually, Ross said, "Why don't we let you get a few hours sleep? We'll take a run at this tomorrow after you get a few hours sleep." Appellant reacted visibly to this statement and asked if he was being taken "downstairs." Ross said, "Yeah, I'll ask them to put you in a cell, is that okay? You want to do that? Because it ain't going to go away, Jimmy." Appellant murmured ". . . cellblock now and just go lay down." Ross said he was going to take "a break" and let appellant "get some rest."

## F. No Rest for the Weary; Detective Thompson Tells Appellant How to "Minimize This Shit"

Despite these statements, appellant was not permitted to rest at this time, nor was he taken to the cellblock. The detectives questioned him some more and talked about how the evidence against him was stacking up. At about 2:30 a.m., Ross and Thompson left the room. After being alone there for about twenty minutes, appellant asked to make a phone call. Shortly thereafter, Detective Thompson returned and talked with appellant about possibly calling his mother.

Then Thompson told appellant he should "try to minimize this shit," because "we know it's a high profile case" and "a lot of people want to see it closed." "If you

were me," Thompson said, "I would take the opportunity to kind of man up to it and say, hey, you know, I was drinking, I was, you know, I was on drugs or something," and "show some remorse." Appellant replied that he could "do that in court." Thompson explained to appellant why he should not trust court: "sometimes you go to court and then, you know, all the facts and everything's stacked up against you and you try to fight it, you know what happens." After further back-and-forth, Thompson told appellant, "[t]he way I look at shit, in every negative there's a positive. If you get [a battery] man, it's a negative side and it's a positive side.... [R]ight now you're on the negative end ... [but] if you work the shit right you flip it on around to the positive side." Appellant stated there were "the courts to deal with that," but Thompson suggested that appellant did not want this particular "real strong" case to go to court. Instead, Thompson told appellant, he should plead guilty so all the evidence would not have to be presented, and then it could be "just like a robbery, a straight robbery."

**G. Appellant Invokes his Fifth Amendment Right to Counsel; "You Don't Want That"**

Thompson next told appellant he would "be surprised what we got" and that the evidence "continue[s] to build up." At that point, appellant stated, "I'm ready [indiscernible] I want to talk—I need to talk to a lawyer now. I've been in this joint now how long now?" In response to this request, Thompson said, "you don't want, you don't want that. Only a fool would want a judge to see all this shit. You know?"

Thompson continued to press appellant to "talk to me, own up to this shit," and appellant continued to say he wanted to "tell the court [his] side." Thompson responded that "the court is not going to be as sympathetic as I am," because this was

such a "high profile case," "a different type of case." Appellant replied, "That's why I'm going to go to court." After further exchanges, Thompson said he would bring another officer into the room. Appellant repeated, "I just want to go to sleep. I don't want to fuck with him, man. I want to go to sleep." To Thompson's proposal that they "take a little break, come back in," appellant said, "I don't want to talk no more. I'm not saying nothing else." Thompson persisted, saying he still wanted appellant to give him a full statement about what happened. Appellant replied, "Nah, I already told you, I already told you that I ain't—I'm just want to lay down. I want to lay down.... I want to go to court. I should of just got a lawyer." Thompson offered once more to let appellant tell his side of the story, and appellant said, "I just want to lay down and go to sleep. I've been sitting up in this damn chair, man."

At around 3:00 a.m., Thompson exited the interrogation room, leaving appellant alone there for about an hour-and-a-half. Appellant spent some of this time with his head down on the table, some of it mumbling to himself, and some of it moving around in his chair. At 4:30 a.m., he asked to go to the bathroom. Detective Thompson took him there. Appellant asked when he would be taken down to the cellblock, and Thompson answered, "when we finish up what we have to do." Thompson then left appellant to sit alone in the interrogation room for another three-and-a-half hours. Appellant lay resting on the floor for part of that time.

**H. "The Best Hope You Got Right Now Is to Show Remorse and Move On."**

Ross and Thompson returned to the room at around 8:00 a.m. After telling appellant that it had been "a long day for everybody," Ross produced the return on a search warrant the police had executed at the address appellant had given when the

detectives had asked him where he had spent the previous night. Ross asked appellant whether, after he saw what had been seized, he "still want[ed] to stay with [his] story." Appellant replied, "I ain't trying to do nothing." Ross then told appellant his whole story was "falling apart," gave him some information about a witness, and said, "[t]hey going to up the charges unless you tell the truth. The best hope you got right now is to show remorse and move on. I'm telling you the truth. Think about it. Think about it." Appellant said he was "ready to go to sleep, man."

Ross then asked for "a small scenario of what your story's going to be" when appellant went to court. Appellant answered, "I don't know. I'm ready to go back to sleep." Ross asked another officer if he wanted to talk to appellant, and appellant said, "I don't want to talk. I'm ready to go to sleep." Ross asked appellant if he had gotten any sleep the previous night; the answer was "no." Ross asked appellant if he needed anything. "Yeah, sleep," appellant replied. Saying he "sympathize[d]," Ross started to ask appellant about his girlfriend. Appellant said he was "done talking." There were some further exchanges along the same lines. Eventually appellant stopped replying at all. At around 8:30 a.m., he finally was taken from the interrogation room to the cellblock.

### I. The Interrogation Resumes; Appellant "Gets It Off His Chest" to "Take the Robbery"

The police planned to resume their questioning of appellant on Sunday afternoon,

when Sergeant Young from the Major Case Unit arrived at the station to participate in the interrogation. Shortly before it was to start, however, at some time between 3:30 and 4:30 p.m., appellant reportedly called out from his cell and asked to speak to Detective Ross. Ross was not available, so a different detective brought appellant to an interrogation room. Appellant then noticed Detective Crespo and called out to him, saying (per Crespo's testimony), "Crespo, I need to—I want to talk to you. I want to tell you what I did. I did it." [5]

Sergeant Young and Detective Crespo proceeded to question appellant forthwith, without re-advising him of his *Miranda* rights or obtaining his waiver of those rights. In response to their inquiries, appellant said that Ms. Fotopoulous had angered him earlier in the week by refusing to give him change when he asked her for it and screaming at him to go away. On the day of the incident, appellant said, he had been drinking, and a flower vendor encouraged him to rob Ms. Fotopoulous in revenge. Appellant took that advice. He followed Ms. Fotopoulous to her home, confronted her, and demanded her money. When she refused to hand it over, he hit her, held her down with his foot, and took it.

In response to the detectives' questions, appellant agreed that no one had forced anything on him and that he did not feel the detectives had made him do anything against his will. He stated that he did not

---

5. I rely on Detective Crespo's account, which the trial court credited, of what happened during the hiatus between the two videotaped interrogations. Appellant denied asking to speak to Ross or calling out to Crespo. He testified that he was able to sleep for about three hours in his cell, and that when he woke up, an officer asked if he wanted anything to eat and escorted him to the interrogation room. There he was confronted by Young and Crespo. At first he did not respond to their questions but, he testified, he started talking when Crespo said he would help him get released on Monday if he would take the robbery charge. The trial court disbelieved appellant's testimony.

know the victim was "that old," he felt "bad" about hitting her and because she was old, and he decided to say "what actually happened" so that he could "get it off [his] chest." "I ain't never done it before," appellant claimed, and he said he "fe[lt] a whole lot better now" after he finished talking. At the conclusion of the session, appellant told Detective Crespo, "so ... don't put no whole lot of extra charges, you know ... I'm going to take the robbery." Crespo informed appellant that he had no control over the charges, and appellant repeated, "I'll take, I'll take, I'll take the robbery you know ... you know I don't need the assault and all that other stuff. I just want to deal with the robbery."

## II. The Detectives Obtained Appellant's Confession by Violating His Fifth Amendment Rights

### A. *Miranda* and *Edwards*

In *Miranda v. Arizona,*[6] the Supreme Court held that police must follow certain procedures to protect a suspect's Fifth Amendment privilege against compelled self-incrimination from the "inherently compelling pressures" of custodial interrogation.[7] Unless those procedures are followed, the Court stated, "no statement obtained from the defendant can truly be the product of his free choice."[8] In brief, to "counteract the coercive pressure" of custodial interrogation, the police must inform a suspect before any questioning that he has both a right to remain silent and a right to the presence of an attorney.[9] If the suspect, "at any time prior to or during questioning," invokes his right to remain silent, "the interrogation must cease."[10] If the suspect requests counsel, "the interrogation must cease until an attorney is present."[11] Furthermore, "[e]ven absent" the suspect's invocation of these Fifth Amendment rights, his "statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [his] rights' when making the statement."[12] For a waiver to be valid, it "must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness' of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"[13] Thus, "any evidence that the [suspect] was threatened, tricked, or cajoled into a waiv-

---

6. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

7. 384 U.S. at 467, 86 S.Ct. 1602. "The Court observed that 'incommunicado interrogation' in an 'unfamiliar,' 'police-dominated atmosphere,' *id.,* at 456–57, 86 S.Ct. 1602, involves psychological pressures 'which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely,' *id.,* at 467, 86 S.Ct. 1602." *Maryland v. Shatzer,* —— U.S. ——, 130 S.Ct. 1213, 1219, —— L.Ed.2d —— (2010).

8. *Id.* (quoting *Miranda,* 384 U.S. at 458, 86 S.Ct. 1602).

9. *Id.*

10. *Miranda,* 384 U.S. at 473–74, 86 S.Ct. 1602.

11. *Id.* at 474, 86 S.Ct. 1602.

12. *Berghuis v. Thompkins,* —— U.S. ——, 130 S.Ct. 2250, 2260, —— L.Ed.2d —— (2010) (quoting *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)).

13. *Id.* (quoting *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). *See also Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) ("[W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege[.]").

er will, of course, show that [he] did not voluntarily waive his privilege." [14] And the suspect must be "aware that his right to remain silent would not dissipate after a certain amount of time and that police would have to honor his right to be silent and his right to counsel during the whole course of interrogation." [15] In other words, "the suspect [must] *know* [ ] that [his] *Miranda* rights can be invoked at any time." [16]

In *Michigan v. Mosley*, [17] the Supreme Court emphasized that the "critical safeguard" in *Miranda's* framework is the suspect's "right to cut off questioning":

Through the exercise of his option to terminate questioning [the suspect] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities *must respect* a person's exercise of that option counteracts the coercive pressures of the custodial setting. [18]

Accordingly, the Court concluded, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " [19]

In *Edwards v. Arizona*, [20] the Supreme Court determined that even the requirement of a knowing, intelligent, and voluntary waiver is not sufficient by itself to protect a suspect's Fifth Amendment rights once the suspect has asked for counsel; "additional safeguards are necessary." [21] The Court accordingly added what it subsequently called a "second layer of prophylaxis," [22] by holding that

when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [H]aving expressed his desire to deal with the police only through counsel, [the accused] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. [23]

And, the Court also held, if the suspect chooses to re-initiate further communication with the police, any resumption of custodial interrogation requires that there then be "a valid waiver of the right to counsel and the right to silence." [24]

---

14. *Miranda*, 384 U.S. at 476, 86 S.Ct. 1602.

15. *Berghuis*, 130 S.Ct. at 2262.

16. *Id.* at 2264 (emphasis added).

17. 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

18. *Id.* at 103–04, 96 S.Ct. 321 (emphasis added).

19. *Id.* at 104, 96 S.Ct. 321 (quoting *Miranda*, 384 U.S. at 474, 86 S.Ct. 1602).

20. 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

21. *Id.* at 484, 101 S.Ct. 1880.

22. *McNeil v. Wisconsin*, 501 U.S. 171, 176, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).

23. *Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880.

24. *Id.* at 486 n. 9, 101 S.Ct. 1880. *See also, e.g., Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (explaining that under *Edwards*, "if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.").

In conjunction with these holdings, the *Edwards* Court took pains to reemphasize *Miranda's* earlier holding that at the time the suspect asserts his right to counsel, the interrogation "must cease." [25] The connection between that requirement and the *Edwards* initiation-and-waiver requirements for any recommencement of the interrogation is clear. The "fundamental purpose" of the *Edwards* rule is to "preserve the integrity of an accused's choice to communicate with police only through counsel, by preventing police from badgering a defendant into waiving his previously asserted *Miranda* rights." [26] The premise of the rule is that, once a suspect asks for counsel, "subsequent requests for interrogation pose a significantly greater risk of coercion" stemming "not only from the police's persistence in trying to get the suspect to talk, but also from the continued pressure that begins when the individual is taken into custody as a suspect and sought to be interrogated—pressure likely to increase as custody is prolonged." [27] "The *Edwards* presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of prolonged police custody, by repeatedly attempting to question a suspect who previously requested counsel until the suspect is badgered into submission." [28] In other words, the suspect must understand that he has a genuine, unconstrained choice whether to permit further interrogation or not; he must "know[ ] from his earlier experience that he need only demand counsel to bring the interrogation to a halt." [29] Otherwise *Edwards's* suspect-initiation-and-waiver requirement cannot serve its intended purpose; it would be meaningless or illusory.

Consequently, where the police have disregarded a suspect's assertion of his Fifth Amendment right to counsel by continuing his custodial interrogation in counsel's absence and "persisting in repeated efforts to wear down his resistance and make him change his mind," [30] and thereby have conveyed to the suspect that he has no real choice whether he will be interrogated further, *Edwards's* preconditions for the resumption of the interrogation cannot be met (unless adequate curative measures are taken). As the Eleventh Circuit has explained,

> Although *Edwards* permits further interrogation if the accused initiates the conversation, the validity of this waiver logically depends on the accused being free from further interrogation. In other words, the "initiation" must come prior to the further interrogation; initiation only becomes an issue if the agents fol-

**25.** *Edwards*, 451 U.S. at 485, 101 S.Ct. 1880 (quoting *Miranda*, 384 U.S. at 474, 86 S.Ct. 1602).

**26.** *Maryland v. Shatzer*, —— U.S. ——, 130 S.Ct. 1213, 1220, —— L.Ed.2d —— (2010) (internal quotation marks, brackets, and citation omitted).

**27.** *Id.* (internal quotation marks omitted). "It is easy to believe that a suspect may be coerced or badgered into abandoning his earlier refusal to be questioned without counsel in the paradigm *Edwards* case," the Court added, "in which the suspect has been arrested for a particular crime and is held in uninterrupted pretrial custody while that crime is being actively investigated. After the initial interrogation, and up to and including the second one, he remains cut off from his normal life and companions, thrust into and isolated in an unfamiliar, police-dominated atmosphere, where his captives appear to control his fate." *Id.* (internal quotation marks and citation omitted).

**28.** *Id.* (internal quotation marks and citations omitted).

**29.** *Id.* at 1221.

**30.** *Michigan v. Mosley*, 423 U.S. 96, 105–06, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

low *Edwards* and cease interrogation upon a request for counsel.... *Edwards* would be rendered meaningless if agents were permitted to continue interrogation after the request for counsel, and then claim that the consequent response by the accused represented initiation and permitted a waiver of the asserted counsel right.[31]

## B. The Violations of Appellant's Fifth Amendment Rights

It is undisputed that the detectives violated appellant's Fifth Amendment rights during his initial thirteen-hour overnight interrogation. The *Miranda* violations were flagrant: the detectives used a variety of improper means as they tried to coerce a confession from appellant. Not only did the detectives persist for hours in questioning appellant and urging him to change his mind despite his repeated assertions of his rights to cut off questioning and to have an attorney present. And not only did they verbally abuse him, deprive him of sleep, ignore his symptoms of alcohol withdrawal, isolate him, keep him handcuffed to a chair for hours, and otherwise subject him to physical and mental discomfort and stress. Appallingly, the detectives also disparaged his exercise of his constitutional rights to counsel and a trial as contrary to his best interests, misled him regarding the benefits of confessing, threatened him that "they" were going to "up the charges" if he did not tell the truth, and even—in their zeal to extract a

confession in this "high profile" case—fed him what he should say (*e.g.,* "say, hey, you know, I was drinking, I was, you know, I was on drugs or something"; "show remorse") regardless of its truth. This was "badgering" with a vengeance. By any measure, the coercion exerted on appellant to waive his constitutional rights and confess was extraordinary. Had appellant given in at 8:30 a.m. on Sunday morning, there is no doubt his confession should have been suppressed.

Appellant did not give in at 8:30 a.m., of course. Exhausted, he took the opportunity to sleep for a few hours first; then he gave in. The issue before us is whether, despite the earlier *Miranda* violations, appellant validly initiated the resumption of his interrogation within the meaning of *Edwards* and validly waived his Fifth Amendment rights. In my view, the government has not carried its burden of showing that appellant did either of those things.

The government has not shown a genuine "initiation" by appellant, because he was afforded no choice in the matter: he remained in the detectives' custody, they told him their questioning would continue when he awoke (whether he liked it or not), and their earlier conduct made clear to appellant that he could not prevent or terminate his further interrogation by asserting his Fifth Amendment rights. What he had to look forward to, therefore, if he continued to resist, was more of the

**31.** *United States v. Gomez*, 927 F.2d 1530, 1538–39 (11th Cir.1991). *See also Collazo v. Estelle*, 940 F.2d 411, 423 (9th Cir.1991) ("Although the words and even the actions that could normally be construed as 'initiation' were present at the outset of the second encounter, an analysis of the substance of the entire transaction—rather than the isolated form of the second encounter—demonstrates that Collazo did not 'initiate' further conversation as that term is used in *Edwards*.... [Rather,] Collazo's words and actions in calling back the officers and in 'waiving' his rights were nothing less than the *delayed product* of [the police officer's *Miranda* violation] three hours previously."); *United States v. Walker*, 624 F.Supp. 103, 106 (D.Md.1985) (explaining that under *Edwards*, law enforcement agents initiated further interrogation when they failed to cease custodial interrogation following arrestee's assertion of his *Miranda* rights).

same obnoxious, coercive, and seemingly unending harassment that he had endured for thirteen hours. The fact that appellant chose to surrender and to avoid putting himself through the ringer again shows only that the detectives' badgering succeeded in overcoming his will; it hardly establishes that appellant chose of his own volition to initiate further communication with the police.

For much the same reasons, in my view, the government has not met its burden of showing that appellant knowingly, intelligently, and voluntarily waived his Fifth Amendment rights. It is utterly immaterial that appellant was aware of his rights in the abstract and knew enough to try to assert them. When he actually and repeatedly did assert his rights, his assertions were ignored. In *this* "high-profile" investigation, Detectives Ross and Thompson made appellant understand, he had no Fifth Amendment rights that he could assert effectively. It is, again, immaterial that the detectives to whom appellant confessed may not have known he had asserted his Fifth Amendment rights.[32] The important point is that when appellant's interrogation recommenced, Detective Crespo and Sergeant Young did not tell appellant they now were prepared, despite the prior violations by Detectives Ross and Thompson, to honor his rights if he chose to assert them. They did nothing to lead appellant to think that, at long last, his rights would be honored; nor anything to remedy their predecessors' other coercive

and misleading interrogation tactics. Because the police made it clear to appellant that he was powerless to exercise his Fifth Amendment rights, he could not knowingly, intelligently or voluntarily waive them so long as he was in their control. A purported waiver of the "right to cut off questioning"[33] cannot be deemed a knowing and intelligent choice where the suspect is led to believe he cannot exercise that right; it cannot be deemed a voluntary choice where the suspect is led to believe he has no choice.

Furthermore, in evaluating whether appellant validly waived his Fifth Amendment rights, we may not ignore all the other grave abuses perpetrated during his overnight interrogation. The fact that appellant was able to withstand those abuses during his prolonged incommunicado interrogation for as long as he did is hardly evidence, as my colleagues take it to be, that his eventual confession flowed from a constitutionally valid waiver of his rights—not when there was never a break in appellant's custody; he knew his interrogation was slated to resume; and he had every reason to apprehend that his interrogators would continue to run roughshod over his rights. The government's claim that the coercive effects of those abuses on appellant subsided with a few hours' sleep in the station house cellblock is neither plausible nor supported by any evidence. That appellant appeared refreshed after his rest does not mean he was uninfluenced by his earlier mistreatment. The

---

**32.** As the Supreme Court explained in *Arizona v. Roberson,*

> [W]e attach no significance to the fact that the officer who conducted the second interrogation did not know that respondent had made a request for counsel. In addition to the fact that *Edwards* focuses on the state of mind of the suspect and not of the police, custodial interrogation must be conducted pursuant to established procedures, and

> those procedures in turn must enable an officer who proposes to initiate an interrogation to determine whether the suspect has previously requested counsel.

486 U.S. 675, 687, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

**33.** *Michigan v. Mosley,* 423 U.S. 96, 103, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (quoting *Miranda,* 384 U.S. at 474, 86 S.Ct. 1602).

detectives did nothing to dispel the coercive effects of their misconduct or to correct the misinformation they furnished appellant to induce him to confess.

Lastly, it is unpersuasive to argue that appellant's initiation and waiver were valid because he acted out of remorse for having assaulted and robbed an elderly woman. The evidence shows that appellant's expressions of remorse were simply the product of the detectives' violation of his rights. It was after appellant unsuccessfully invoked his right to cut off the questioning that the detectives improperly honed in on the serious and inflammatory circumstances of the robbery and counseled appellant to show remorse in order to "flip it on around to the positive side." Indeed, it is striking how appellant parroted what the detectives instructed him to say. They told him his "best hope" was to show remorse and that anyone in his position would want to get the crime "off their chest." When he confessed, appellant reiterated that he felt "bad" and decided to "get it off [his] chest." Detective Thompson told him to say he was drinking and try to "minimize" the offense. When appellant confessed, he said he was drinking and offered other facts in extenuation (*e.g.*, the victim had offended him, a bystander told him to rob her (after he had been drinking), he did not know she was "that old," and he had never committed such a crime before). If appellant followed his advice, Detective Thompson told him, he would be able to plead guilty to only "a straight robbery." When appellant confessed, he repeated that he wanted to "take the robbery" and did not "need the assault and all that other stuff." Appellant's expressions of remorse may have been genuine, but they fail to prove the validity of his initiation and waiver.

For the preceding reasons, I dissent from my colleagues' conclusion that appellant knowingly, intelligently and voluntarily waived his Fifth Amendment rights, and that his confession was the "product of a free and deliberate choice rather than intimidation." *Ante* at 234. In my view, the record shows exactly the opposite.